THE STATE OF OHIO, )
                  ) SS:   JACKSON, J.
COUNTY OF CUYAHOGA.)

              IN THE COURT OF COMMON PLEAS
                CRIMINAL DIVISION

THE STATE OF OHIO,        )
                   )
          Plaintiff, )
                   )
    -v-             ) Case No. CR-605515
                   )
ANDREW JAMES CARR,       )
                   )
          Defendant. )

                     - - - -

       DEFENDANT'S TRANSCRIPT OF PROCEEDINGS

                     - - - -

APPEARANCES:

    TIMOTHY J. McGINTY, ESQ.,
    Prosecuting Attorney,
    by: JOHN KIRKLAND, ESQ., Assistant County
    Prosecutor,

        On behalf of the Plaintiff;

    JOSEPH PATITUCE, ESQ.,

        On behalf of the Defendant.

Mary E. Schuler, RMR
Robert Lloyd, RMR, CRR
Official Court Reporter
Cuyahoga County, Ohio



```
1   THE STATE OF OHIO, )
                        )  SS:   JACKSON, J.
2   COUNTY OF CUYAHOGA.)
```

3                IN THE COURT OF COMMON PLEAS
                        CRIMINAL DIVISION

```
4   THE STATE OF OHIO,              )
                                    )
5                   Plaintiff,      )
                                    )
6       -v-                         ) Case No. CR-605515
                                    )
7   ANDREW JAMES CARR,              )
                                    )
8                   Defendant.      )
```

9

10                                  -   -   -   -

11

12          DEFENDANT'S TRANSCRIPT OF PROCEEDINGS

13

14                                  -   -   -   -

15

16              BE IT REMEMBERED, that at the September

17      2016 term of said Court, to-wit, commencing on

18      Tuesday, October 11, 2016, this cause came on to

19      be heard before the Honorable Michael Jackson, in

20      Courtroom No. 15-D, Courts Tower, Justice Center,

21      Cleveland, Ohio, upon the indictment filed

22      heretofore.

23

24                                  -   -   -   -

25

```
 1                        INDEX

 2

 3                 Direct   Cross   Redirect   Recross

 4   STATE'S WITNESSES:

 5   Alfred Johnson        23       40        67     72, 82, 84

 6   Tom Halley            85       88        91     93

 7

 8   EXHIBITS:               Offered     Received

 9   State's:

10   1 - affidavit            94          95

11   Defendant's

12   A - CIF form             94          95

13   B - complaint form       94         95

14   C - Facebook post        --          --

15

16      ** All exhibits retained by the Court.   **

17

18

19

20

21

22

23

24

25
```

1    TUESDAY AFTERNOON SESSION, OCTOBER 11, 2016

2             MOTION TO SUPPRESS

3        THE COURT:    We are here this

4    afternoon in Case Number 605515, State of Ohio vs.

5    Andrew Carr.  Mr. Carr is present in the courtroom

6    today.  He's represented by Attorney Joe Patituce.

7    And representing the State of Ohio, Assistant

8    County Prosecutor John Kirkland.

9        We are here today on a motion to suppress

10    filed by counsel for Mr. Carr.  This is a

11    continuation of a prior hearing.

12        Mr. Kirkland, remind me where we are in

13    the process of this hearing.

14        MR. KIRKLAND:    Actually, your Honor,

15    we had not taken any testimony in the prior

16    hearing at all, your Honor.  It had been continued

17    to this date.

18        There was an issue with a motion to quash

19    and then availability of the detective who drafted

20    the search warrant; he was in another matter, your

21    Honor; on that date he was in trial in another

22    case in another courtroom, so we just continued it

23    to this date, your Honor.

24        THE COURT:   Now, I recall there was a

25    subpoena issued or some sort of notice of

1    appearance for Judge Astrab; is that correct,

2    Mr. Patituce?

3        MR. PATITUCE:    Your Honor, there was

4    a subpoena that was issued in the ordinary course

5    that subpoenas are issued through the clerk's

6    office.  It's my understanding that the Cuyahoga

7    County Sheriff's Office served that subpoena on

8    some -- a floor either bailiff or deputy.

9        Since we don't personally tell the

10    sheriffs how to serve it or where to serve it, I

11    believe they served it on Judge Astrab.

12        He got notice of it, called my office

13    less than pleased that he had received a subpoena,

14    and following that I believe the Cuyahoga County

15    Prosecutor's Office through Prosecutor Graham, who

16    is here in the courtroom, has entered her

17    appearance and filed a motion to quash.

18        THE COURT:    And is it your intention

19    to pursue that subpoena and require Mr. -- or

20    Judge Astrab to be in the courtroom subject to

21    testimony?

22        MR. PATITUCE:    Your Honor -- the

23    short answer is yes.  And I had actually sought

24    through the other Cuyahoga County prosecutor from

25    the criminal division certain stipulations that

1   actually relate to matters of public knowledge

2   such as -- the basis of why I wanted to call him,

3   stipulating that Judge Astrab was the victim of

4   the Heartless Felons; that Detective Johnson was

5   the detective who did -- stipulations that are

6   public knowledge, nothing that gets into impugning

7   Judge Astrab's integrity or honesty or anything

8   like that.

9        Unfortunately, the prosecutor, criminal

10   division, has refused to enter into those

11   stipulations, so, unfortunately, I'm left with a

12   situation where I offered up in good faith

13   stipulations that I don't believe can be

14   contested; they're a matter of public knowledge,

15   but to get them in the record properly before you,

16   your Honor, I believe I think I'm left with no

17   alternative than to ask Judge Astrab to testify to

18   what we know to be public record.

19        I would like to avoid it, but to get it

20   in and to protect my client, if the criminal

21   division won't stipulate, I mean I understand the

22   civil division here is -- I have one division

23   saying they aren't going to stipulate and the

24   other division saying, We don't want him to

25   testify.

1        Under the second prong of Franks, I can
2    raise an argument that Judge Astrab was not
3    neutral and detached based on what I think is
4    normal human emotion having yourself or your
5    family threatened.
6        So I'm left with a, sort of a Catch-22,
7    your Honor.  I would like to stipulate in good
8    faith to what's playing, but at the same time, one
9    division says, no, it won't stipulate and the
10   other says --
11        THE COURT:    I understand your point.
12   But further on the point itself, I take it then
13   your primary thrust of questioning for Judge
14   Astrab would be about this public information
15   about the case that he had had previously and the
16   impact you assert that case may have had on him
17   vis-a-vis signing off on this search warrant when
18   presented to him for examination and analysis and
19   eventually executing.
20        MR. PATITUCE:    Yes.
21        THE COURT:    So, you're not going to be
22   asking questions about his thought processes and
23   procedure and events that took place in executing
24   the search warrant in this case.
25        MR. PATITUCE:    No intention to ask

1    any question relating to that.

2          THE COURT:      All right.  And is it

3    Ms. Graham?

4          MS. GRAHAM:      Yes.

5          THE COURT:      You're here on behalf of

6    the prosecutor's office civil division on behalf

7    of Judge Astrab.

8          MS. GRAHAM:      Yes, I'm here on behalf

9    of Judge Astrab.  Our motion to quash is based on

10   two factors, first the procedural issue that he

11   was not properly served.

12         Second, beyond that, even if he had been

13   properly served that there's not a sufficient

14   basis for the Court calling Judge Astrab in this

15   case.

16         Mr. Patituce said the things that he

17   wanted to ask him about are public knowledge.

18   They can be obtained from other sources.  So there

19   is no need to call Judge Astrab to testify to

20   those things.

21         The standard is a high burden for a

22   defendant to have a judicial officer testify in a

23   case and that would be when the source -- when the

24   information can't be obtained from any other

25   source.  And here he's already said that it's

public knowledge and it can be obtained from other
sources so that would not be a reason to put Judge
Astrab on the stand.

THE COURT: And have you thought
through as to what those sources might be?

MS. GRAHAM: If he's saying there was
a case in which Judge Astrab was involved in, he
could present a public record of that case; he
could ask the detective about it. He's saying the
detective has knowledge of this. That's another
witness that can testify to these very issues that
he wants to ask Judge Astrab about.

MR. KIRKLAND: Your Honor, I would
note that Detective Johnson here was the
investigating detective I believe in the case that
Mr. Patituce is referring to and to that extent he
might be able to answer some of the questions
regarding that case that involved Judge Astrab, et
cetera. And obviously he's here.

MS. GRAHAM: And further, your Honor,
the standard, you know, is that -- to show that a
judge wholly abandoned his judicial role here.
And there's been simply no argument of that, that
Judge Astrab abandoned the judicial role. His
only role in this was simply signing the warrant

1    so that's inherently his judicial role and he

2    shouldn't be on the stand to be questioned about

3    that.

4                THE COURT:     Mr. Patituce, your

5    thoughts concerning Ms. Graham's arguments?

6                MR. PATITUCE:     The argument regarding

7    the wholly abandonment, the whole abandonment of

8    the judicial role is misplaced in this case.

9                This isn't a case where -- the case that

10   the prosecutor is referring to would be if I was

11   accusing you, your Honor, of abandoning your

12   judicial role; in other words, if you went out and

13   conducted your own investigation or you ordered

14   the police to do certain things.

15               This isn't necessarily a Leon case.  This

16   is a Franks case.  This is whether or not the

17   magistrate objectively was neutral and detached.

18   This isn't an abandonment case under Leon.  This

19   is a Franks case where it's neutral and detached.

20               And as it relates to the argument about

21   whether or not I can obtain some of this

22   information from the detective, I obviously could

23   obtain some of this from the detective, but the

24   best evidence rule is the person who was

25   threatened.  He was the victim of the Heartless

1    Felons.  I believe he has information.  He's

2    talked about it, for instance, on Facebook and I

3    am entitled -- my client actually is the one who

4    is entitled to have Judge Astrab testify to the

5    material that is outside of his deliberative

6    process.

7         I'm not asking him to answer any

8    questions about what he considered to be relevant,

9    what he considered to be important; if he believed

10   there was probable cause.  I'm not seeking to ask

11   him any questions about that.  And as such he

12   should be treated as any other witness that the

13   defense is seeking to subpoena.

14        As the Court knows, the defendant has the

15   fundamental right to compulsory process.  That

16   is -- I respect judges; I have a lot respect for

17   Judge Astrab, but compulsory process applies to

18   judges.  I'm not asking him to testify about his

19   role as a judge -- I'm asking him to testify

20   about -- his role as a judge deliberating on what

21   happened here -- I'm asking him to testify.  I'm

22   seeking an order for him to testify as to the

23   activities regarding the Heartless Felons that he

24   was personally involved with.

25        THE COURT:    But you -- I would assume

1  at some point in time you're going to try to make

2  the connection between what you believe might be

3  the case, that he was, to use your term and

4  characterizing Franks, that he was one, either not

5  neutral or not detached, or both, and as a result

6  of that he should have what, with regard to this

7  request for a search warrant?

8  MR. PATITUCE:    He should have recused

9  himself, your Honor.

10  THE COURT:    So there is a connection

11  with this case and the search warrant but it's not

12  to his conduct in determining whether it was

13  probable cause to grant it, it's just that he was

14  in a situation where you believe he was not

15  neutral and detached and he should have separated

16  himself from this case.

17  MR. PATITUCE:    Yes, your Honor.

18  THE COURT:    Is there anything on the

19  face of the search warrant itself or in this case

20  that specifically references and includes and

21  involves Heartless Felons?

22  MR. PATITUCE:    Yes, your Honor.

23  THE COURT:    And is that in the search

24  warrant?

25  MR. PATITUCE:    Yes, your Honor.

1           MR. KIRKLAND:    That would be

2   accurate, your Honor.

3           THE COURT:    I didn't hear you, Mr. --

4           MR. KIRKLAND:    That's accurate.  It

5   is in the search warrant.

6           MR. PATITUCE:    I believe it's

7   repeated in seven of the 25 paragraphs.

8           MR. KIRKLAND:    I didn't count but --

9           MR. PATITUCE:    I believe it would be

10  more.

11          MS. GRAHAM:    Your Honor, if I may.

12          THE COURT:    I was getting back to you

13  so I can write more quickly.  There you go.

14          MS. GRAHAM:    Defense counsel's

15  argument that the Judge should be treated like any

16  other witness is not correct based on the law.

17          There is a higher standard when it comes

18  to calling judicial officers as witnesses in a

19  case and the standard is that they should only be

20  called if there's no other witness that could

21  testify about similar matters, and here we have

22  another witness who can.

23          So just to put the Judge on the stand to

24  simply question his integrity and whether or not

25  he was, you know, had some underlying, without

1    really much of a factual support other than an

2    argument that it would only be natural for him to

3    feel a bias towards gangs; that this would somehow

4    impede his impartiality in performing his judicial

5    duties is not enough to overcome that standard.

6         THE COURT:    Well, do you agree with

7    the proposition under Franks that a judicial

8    officer, in this case Mr. or Judge Astrab, has to

9    be neutral and detached, that that's the standard?

10        MS. GRAHAM:    I do agree he has to be

11   neutral and detached.

12        THE COURT:    Just to use Detective

13   Johnson as an example, how would his testimony, if

14   that's another source of information that you

15   suggest exists, how would Detective Johnson be

16   able to determine whether or not Judge Astrab is

17   neutral and detached with regard to taking on the

18   responsibility of considering a search warrant

19   when that search warrant involves Heartless

20   Felons?

21        MS. GRAHAM:    I would say that you

22   have to be able to show that there was some

23   conduct on the part of Judge Astrab that

24   demonstrates that he was not neutral and detached.

25   Here there was no conduct whatsoever.  It's just

1    assumed argument that he was inherently biased

2    without any action or support to show -- any

3    conduct that he conducted that would show that.

4           For example, he would not be neutral and

5    detached if he had separated himself from his role

6    as a judge and did something where he went forward

7    in conducting the warrant or something along those

8    lines.

9           THE COURT:   Mr. Patituce, what's your

10   response to counsel's observation that the

11   detective could describe his conduct in dealing

12   with this situation, that that would get some

13   facts toward his neutral and detached mind-set or

14   lack of it in that circumstances?

15          MR. PATITUCE:   Your Honor, I disagree

16   with the proposition that the detective is capable

17   of testifying to what is in the mind -- again as

18   relates to the threats he received of Judge Astrab

19   for instance, I'm not sure if --

20          THE COURT:   Let me just stop you right

21   there.  Ms. Graham didn't say anything about

22   trying to understand his mental thinking.  She was

23   describing testimony regarding the judge's

24   conduct.

25          I think even the basic jury instructions

1    says you can't read what's in someone's mind but

2    you can observe their conduct and the conclusions

3    regarding their conduct as to what's going on in

4    their mind.

5         So I think that's a pretty standard jury

6    instruction.  Better than what I've articulated

7    here today, but I think you get the concept and I

8    would suspect that's what she was suggesting that

9    this officer, this detective, or someone else

10   could describe how he was handling this particular

11   search warrant, what he said, what his mannerisms

12   were, how he dealt with this and whether it was an

13   indicator along the lines of what you're thinking

14   or it was an indicator that he was neutral and

15   detached.

16        MR. PATITUCE:    First, your Honor, I

17   believe that would be asking the witness to reach

18   a legal conclusion.  But as relates to conduct

19   your Honor, I do have evidence here that Judge

20   Astrab was influenced by this and I have it in his

21   own words.

22        I have before me a Facebook post of

23   September 22, 2015 where he references the "stress

24   by the death threats."  So I do believe -- and I

25   have that here in front of me, your Honor, if the

1     Court wishes to review it.

2           So Judge Astrab has put out into the

3     public the stress that he felt from the death

4     threats.  Obviously this manifested on him some

5     sort of stress that he publicly posted or made a

6     representation to the world about this so I

7     believe that Judge Astrab is the only one who can

8     testify as to that, how it impacted him

9     personally.

10          And does this Court, your Honor, in

11    determining whether or not he was neutral and

12    detached take -- how does the Court weigh that

13    evidence other than from him, because as Judge

14    Astrab has stated, it's been a tough few months

15    with stress from the cases, death threats, and he

16    goes on further.  That is -- that's manifest

17    conduct.

18          THE COURT:    Let me interrupt you and

19    try to proceed.  See if we're dealing with only

20    one particular issue or -- do you anticipate

21    challenging the search warrant on any other basis?

22          MR. PATITUCE:     Yes, your Honor.  Yes.

23          THE COURT:    So there's something about

24    the search warrant itself that you're challenging?

25          MR. PATITUCE:     Yes.

1    THE COURT:     Well, what I think we will

2    do at this point is that we'll take evidence as to

3    the search warrant itself because we're apparently

4    ready to do that today.

5         MR. KIRKLAND:     Yes, your Honor.

6         THE COURT:     And we will all continue

7    to consider whether or not we'll need Judge Astrab

8    and that issue as a secondary basis we're not

9    going to resolve that issue today.

10        I understand the arguments.   Have you

11   briefed that, Ms. Graham, as well?

12        MS. GRAHAM:     I did and I have one

13   more comment to make about what was just said

14   regarding him wanting to get into the mind of

15   Judge Astrab.

16        First of all, he's basically imputing

17   something on the Judge based on his own personal

18   feelings of what he thinks the Judge must have

19   felt and that there must be a bias.   But the

20   standard of law regarding judges is that bias and

21   prejudice on the part of a judge cannot be

22   presumed.

23        So, feelings regarding what happened in a

24   prior incident or prior case are not a basis to

25   show that he was prejudiced in this case and there

1    should be a presumption that he was not biased in
2    this case and without facts regarding this
3    incident in this one to show how he was biased or
4    impartial here and there's nothing to support
5    that.
6        THE COURT:    Well, on your
7    interpretation of these cases are there any
8    circumstances for a judge who issues a search
9    warrant to be required to testify?
10       MS. GRAHAM:    If an example happened
11   where a judge went out and personally executed a
12   warrant or something like that and he crossed the
13   line abandoning, wholly abandoning his judicial
14   role, then that would be a scenario.
15       But that certainly did not happen in this
16   case.  He is simply the Judge that signed the
17   warrant in this case.
18       THE COURT:    What if a Judge made
19   statements to others or on Facebook that involved
20   the potential defendants in the search warrant?
21   Is that sufficient to inquire?
22       MS. GRAHAM:    I don't think it is,
23   your Honor, because there would have to be
24   something -- something to show that when the
25   warrant was being executed not just an overall

1    opinion about, you know, gangs or something along

2    those lines; that wouldn't be sufficient to meet

3    the standard.

4              THE COURT:    Okay.  So you made your

5    points for the record at this point.

6              MS. GRAHAM:    Yes, your Honor.

7              THE COURT:    Anything else you want to

8    add on the issue of Judge Astrab before we

9    continue on and take testimony?

10             MR. PATITUCE:    Just as I understand

11   the Court's -- what the Court is saying we're

12   going to do today, that was going to be my

13   suggestion to proceed.  What we have here -- am I

14   permitted to ask Detective Johnson questions

15   regarding Judge Astrab or is that wholly going to

16   be tabled to another day?

17             Because my concern is if the Court agrees

18   that perhaps I can get this from Detective

19   Johnson, I don't want to preclude myself from

20   asking those questions.  If we save that part for

21   another day, that's fine, or I can ask him.  I

22   just want to make sure I'm following Court

23   procedure.

24             THE COURT:    Is there any objection by

25   either prosecutor if defense counsel asks

1    questions concerning how the Judge conducted

2    himself concerning -- regarding this search

3    warrant?

4         MS. GRAHAM:    No, I don't object to

5    that.

6         MR. KIRKLAND:    I don't object.

7         THE COURT:    You're permitted to do

8    that.  Now we'll focus on the search warrant

9    itself and that's the main focus of our testimony

10   except as you discussed.

11        I do want to put on the record, at least

12   make sure everybody understands this and I think

13   it's an important point.

14        There is a practice, I don't think it's a

15   policy, at least a practice among the prosecutors

16   that if someone challenges a search warrant, that

17   thereafter whatever the success of that motion is,

18   there will be no plea bargaining in the case or

19   plea discussions in the case and the defendant

20   will either face the indictment and deal with that

21   in terms of the plea deal or go to trial.

22        I don't know if that's Mr. Kirkland's

23   practice or not, but I do think it's an important

24   point to put on the record so that the defendant

25   is not unduly surprised if that situation

1   develops.

2          MR. KIRKLAND:    Your Honor, to answer

3   that question in circumstances of this case, I

4   would not state that that would be necessarily

5   appropriate.

6          THE COURT:    So going forward on the

7   motion filed by the defense and actually

8   proceeding to challenge the warrant that's not

9   going to lead you one way or the other in deciding

10   whether or not it would be appropriate to

11   entertain a plea offer or a plea discussion if

12   that would arise at some point in time in the

13   future.

14          MR. KIRKLAND:    No, your Honor.

15          THE COURT:    All right.  With that

16   understood, Mr. Patituce, you filed the motion.

17          Mr. Kirkland, are you prepared to go

18   forward?

19          MR. KIRKLAND:    Yes, I am, your Honor.

20          THE COURT:    So why don't you go

21   forward and we'll have Mr. Patituce cross-examine.

22          MR. KIRKLAND:    Thank you.  State

23   would call Detective Alfred Johnson of the

24   Cleveland Police Department.

25          MR. PATITUCE:    Just a separation of

1  witnesses, your Honor.

2          THE COURT:    Granted.

3          - - - - -

4      The STATE OF OHIO, to maintain the issues on

5      its part to be maintained, called as a witness,

6      ALFRED JOHNSON, who, being first duly sworn, was

7      examined and testified as follows:

8      DIRECT EXAMINATION OF ALFRED JOHNSON

9  BY MR. KIRKLAND:

10  Q.    Sir, could you state your name and spell your name

11  for the record.

12  A.    Detective Alfred Johnson, J-O-H-N-S-O-N, badge

13  number 60.

14  Q.    And by whom are you employed?

15  A.    City of Cleveland, Division of Police.

16  Q.    And how long have you been employed by the police

17  department?

18  A.    Since 2007.

19  Q.    And could you briefly describe your assignments in

20  the last nine years or so.

21  A.    Initially I was assigned to Fifth District patrol,

22  the old sixth, the new Fifth District near the

23  St. Clair area.  I then moved to the community services

24  unit in the Fifth District.  From there I went to the

25  Third District community services unit and from there I

1  went to the Gang Impact Unit.

2  Q.    Could you explain what the community services unit

3  does?

4  A.    Community services unit deals with community

5  problems, councilmatic complaints.  Usually if someone

6  makes a complaint about a street or an area, we would

7  go there and try to resolve the complaint.  We will

8  also deal with the community conversations and try to

9  make community police relations better.

10  Q.    And when did you join the Gang Impact Unit?

11  A.    2013.

12  Q.    And have you had any specialized training in

13  connection with that assignment?

14  A.    Yes.

15  Q.    Can you briefly describe that for the record.

16  A.    Okay.  Before I was a Cleveland police officer, I

17  worked in the Cuyahoga County Sheriff's Department on

18  the SRT team.

19          THE COURT:    SRT would be what?

20  A.    Special response team.

21  Q.    Thank you.

22  A.    As a member of the SRT team we responded to fights

23  with inside the jail and I got training in dealing with

24  those fights and also just training into use of force

25  situations.

1    From there I had training in the academy for the

2  police.  I've also received numerous trainings for gang

3  investigations.  Certified gang investigative

4  specialist from OPOTA.  Went to that class twice.  I

5  went through search and seizure class.  I went through

6  interview and interrogation classes.  From 2008

7  through -- through 2016, I went to numerous courses and

8  received numerous certifications.  And just in 2015 I

9  started to actually teach my own classes.

10  Q.    Where are you teaching those classes, detective?

11  A.    I've taught classes in Akron, Ohio.  I've taught

12  classes for the prosecutor's office.  I've taught

13  classes for parole.  I've taught classes for juvenile.

14  Q.    Are you familiar with a group called the Heartless

15  Felons?

16  A.    Yes.

17  Q.    How did you first come in contact with that group

18  or how did you first learn of that group, detective?

19  A.    While working in the Cuyahoga County Jail, again I

20  said we responded to fights.  I initially started

21  working there in 2002.  Those fights initially were

22  like one-on-one fights.  It wasn't really group or gang

23  fights until approximately 2005 we started to see group

24  fights, like five or six people on one.  We started to

25  investigate why those fights happened and we became

1  aware of this gang, the Heartless Felons.

2       We decided to separate the leaders of these gangs

3  and put them in different pods inside the jail areas

4  where inmates lived.

5  Q.   While doing that we also were -- well, I was able

6  to categorize who the leaders of this Heartless Felons

7  gang were and had conversation with those leaders.

8       From there in the Fifth District CSU we had

9  councilmatic complaints for one of the members, Donte

10 Ferguson, who had gotten out and was, for lack of a

11 better word, terrorizing the area of Nathaniel, 156th

12 and St. Clair.

13      Councilman Mike Polensek sent an email to my

14 commander stating he wants to know what was going on

15 and we tried to assist in dispersing that gang in that

16 area which led to -- actually that gang was responsible

17 for the Five-Six Bricks versus the Lake Shore

18 shootings.  Donte Ferguson actually went to the federal

19 prison in 2015 I believe or 2014.

20 Q.   Was that --

21 A.   I'm sorry.

22 Q.   And you continued your investigations into the

23 Heartless Felons; would that be accurate?

24 A.   Yes.

25           MR. KIRKLAND:    May I approach, your

```
 1        Honor?
 2             THE COURT:     You may.
 3   Q.   Detective, I've handed to you what has been marked
 4   for purposes of identification as State's Exhibit 1.
 5        Could you quickly read that?
 6             MR. PATITUCE:     Yes, I did.
 7   A.   Yes, I recognize this as the affidavit in the
 8   search warrant.
 9   Q.   Going to the affidavit on page 9 of paragraph 25.
10   A.   Yes.
11   Q.   Is that your signature there, detective?
12   A.   Yes.
13   Q.   Do you remember drafting this affidavit and search
14   warrant?
15   A.   Yes.
16   Q.   And to whom did you present the affidavit and
17   search warrant?
18   A.   It was first reviewed by the prosecutor's office
19   and then presented to Judge Astrab.
20   Q.   By yourself?  Presented to Judge Astrab by
21   yourself; is that correct?
22   A.   Yes.
23   Q.   And did he -- is that his signature below your
24   signature?
25   A.   Yes.
```

Q.   And was that on the 12th day of April as
indicated?

A.   Yes.

Q.   And when did you again join the Gang Impact Unit,
detective?

A.   In 2013.

Q.   Has a significant amount of your investigative
efforts been directed towards the Heartless Felons?

A.   Well, it would be a lot of investigative efforts
directed to the Heartless Felons.

Q.   Among other gangs?

A.   Among other gangs, yes.

Q.   I'd like you to briefly describe -- I mean set
forth have you reviewed this affidavit?

A.   Yes.

Q.   And having reviewed it, does it set forth accurate
statements as to your investigation in connection with
Michael Menefield?

A.   Yes.

Q.   When did Michael Menefield first come to your
attention?

A.   Michael Menefield first came I believe it was
2014.

Q.   And how did he come to your attention?

A.   I was investigating Instagram posts of a man,

Daryl Patton Jr.

Q.   Is that reflected in paragraph three of the affidavit?

A.   Yes.

Q.   Specifically in paragraph three you indicate that you're looking at Daryl Patton and you came up with, correct me if I'm wrong, a social media account which was MilezAv, M-I-L-E-Z-A-V, underscore MilesAv felon 8631.

A.   That's what it's supposed to be, Miles Avenue.   I couldn't quite figure that out looking at it.

Q.   And what's the significance you set forth in paragraph three, the significance of the 8631?   What exactly -- can you state for the record what is the significance at the end of that social media account?

A.   8631 is the numerical relation to the alphabet HFCA which is Heartless Felons collaboration.

Q.   The H, if I understand correctly here, is the eighth letter in the alphabet.

A.   Yes.

Q.   And then after that F would be the sixth letter?

A.   Correct.

Q.   Is that, in your experience, is that a frequent acronym or code that they utilize?

A.   Yes, that's a frequent acronym.

1 Q.   You've seen it?

2 A.   Yes.  Multiple times.

3 Q.   And this was back when?  What year was this again?

4 A.   2014.

5 Q.   Early part of 2014?

6 A.   Yes.

7 Q.   And this is spelled out in paragraph three,

8 paragraph four --

9 A.   Yes.

10 Q.   -- of your affidavit?

11 A.   Yes.

12 Q.   And you determined that as set forth in paragraph

13 four that that Instagram account was associated with

14 Daryl Patton Jr.; is that correct?

15 A.   Yes.

16 Q.   And based upon your investigation into Mr. Patton,

17 what next did you do in regards to Mr. Patton?

18 A.   After finding Mr. Patton posted several firearms

19 for sale we were able to find the address of

20 Mr. Patton, his listed address as 8815 Walker in

21 Cleveland.  We then went to the house and did a consent

22 search and recovered one of the weapons, a fully

23 automatic firearm and some Heartless Felons

24 shoes.  They was actually Timberland boots with

25 Heartless Felons stuff written on them.

1  Q.    Did that set forth in paragraphs five, six, and in

2  paragraph seven you indicate that he was arrested; is

3  that correct?

4  A.    Yes.  Daryl Patton was not at the house at the

5  time.  Because he was not at the house, we could not

6  put the weapon in his possession.  He actually took the

7  Instagram posts but his pictures was not in the

8  photo.  But what he did later was on St. Patrick's Day

9  in 2014, he came downtown with a firearm and he was

10 arrested by members of the Gang Impact Unit.

11 Q.    Going forward from there, you continued the

12 investigation into the Heartless Felons; is that

13 correct?

14 A.    Yes.  With Daryl Patton Jr.'s accounts we were

15 able to see people he was communicating with and also

16 members who also used Heartless Felons language and

17 lingo so we were able to follow those males and females

18 also.

19 Q.    Okay.  Back in August, August 1st of 2014, was

20 there an incident that you set forth in paragraph ten

21 involving Daryl Patton?

22 A.    Yes.

23 Q.    I know it's set forth in paragraph ten, but could

24 you briefly describe it, please?

25 A.    Daryl Patton Jr. posted on Instagram a picture of

himself, Michael Menefield and Deshawn Scruggs. They
were handling firearms in a motor vehicle and they said
that they were going to Club XL, also known use the
Executive Lounge, in downtown Cleveland.

We had this information and we were out in the
area when a call came across our radios for a fight at
the Executive Lounge. Knowing that these guys were
there, I responded and I was able to see Daryl Patton
Jr. get into a vehicle with Michael Menefield and
Deshawn Scruggs. I called for a backup. Cars arrived.
They conducted a traffic stop. In this traffic stop
they found two handguns, and one holster inside the
vehicle.

Daryl Patton Jr. pled guilty to improperly
handling firearms in a motor vehicle on January 6th,
2015. Case Number 2014-588008.

Q. Now, Michael Menefield, was he also charged in
connection with that incident?

A. I'm sorry. Michael Menefield pled to that, if I
said that wrong. But, yeah, Michael Menefield was
charged and pled to that. Daryl Patton Jr. was
not. He only had a holster at the time.

Q. And as a result of that case you said he pled
guilty that is Michael Menefield did, January 6th of
2015; is that correct?

A.   Yes.

Q.   Was that the first time you'd come into contact with Michael Menefield?

A.   Yes.

Q.   Now, as you indicated in paragraph 11 of the affidavit, Michael Menefield left prison on September 21st of 2015; is that correct?

A.   Yes.

Q.   In fact did you discover a social media post of him relative to his getting out of prison?

A.   Yes.   We continued to monitor his social media account and that was underscore Mikey underscore 216. He actually posted the day that he got out of prison.

It was a pictures of him and a female in front of the facility that he was housed in.

Q.   And when you saw that post on that Instagram account you recognized Michael Menefield; is that correct --

A.   Yes.

Q.   -- through previous contacts?

A.   Yes.

Q.   This is set forth in paragraph 13 of Exhibit A; is it not --

A.   Yes.

Q.   -- of your affidavit; is that correct?

A.    Yes.

Q.    You indicated on October 27th of 2015 that you monitored that Instagram social media account and observed something else; is that correct?

A.    Yes.

Q.    And what exactly did you observe?

A.    I observed Michael Menefield shooting an AK-47 at a firing range.

Q.    And that is set forth in paragraph 13 of your affidavit, is it not, detective?

A.    Yes.

Q.    Now, as part of your investigation into the Heartless Felons did you investigate an individual known as Marvin Linder?

A.    Yes.

Q.    And as a result of that particular investigation did you conduct a search of his address or any address associated with him?

A.    Yes.

Q.    And what was that address, sir?

A.    This address was 15609 Steinway in Maple Heights, Ohio.

Q.    When was that?  Do you remember roughly when that search was conducted?

A.    On November 12, 2015.

Q.   And during that search did you recover any
weapons?

A.   Yes.  We actually recovered several weapons
including an AK-47.  I believe it was at least six
handguns.

Q.   As it pertains to this particular case before us
and the investigation into Mr. Menefield, did you
contact a confidential informant regarding that AK-47
or did a confidential informant contact you?

A.   Yes.

Q.   And what was indicated to you at that time about
the AK-47?

A.   The AK-47 was either purchased or -- purchased
from Michael Menefield or belonged to Michael Menefield
and was given to Marvin Linder to hold.  The
confidential informant actually told me who Michael
Menefield was.  He pointed out a picture of Michael
Menefield and told me where Michael Menefield lived.

     He also told me where Michael Menefield lived
before on the same street on Milan in Maple
Heights.  And I was able to pull up a Goggle maps photo
of the house which I showed the Google maps photo to
him and he confirmed that this is the house where he
lived.

Q.   Detective, I have to ask this question.  Those

1  particular details that you just provided to me as to

2  showing him the house, et cetera, and the picture of

3  him, that is not set forth in the affidavit; is that

4  correct, as you look at it today?

5  A.    Correct.

6  Q.    Quite frankly you forgot to put those in there.

7  A.    No.  The basis of the search warrant was the

8  information and the address that we had for Michael

9  Menefield.

10  Q.    Okay.  I'll come back to that later.  But those

11  details that you just described to me about your

12  interaction with the confidential informant, those are

13  not in that particular -- information is not in the

14  affidavit save for the information that he indicated

15  that the AK-47 that Marvin Linder had came from Michael

16  Menefield in some way.

17  A.    Correct.

18  Q.    Did you continue to monitor -- and again that

19  particular information as to Marvin Linder and the

20  AK-47 set forth in paragraphs 14 and 15 of the

21  affidavit; is that correct, detective?

22  A.    Yes.

23  Q.    Did you continue to monitor the social media that

24  you associated with Michael Menefield specifically

25  underscore Mikey underscore 216?

A.    Yes.

Q.    And on October 9th of 2016 did you find any
particular information that you utilized to obtain this
search warrant?

A.    Yes.

Q.    Could you briefly describe what that was,
detective?

A.    There was a video of Michael Menefield driving a
vehicle.  He had four handguns in his lap and a handful
of folded U.S. currency.  He was playing with the
handguns as he was driving in the vehicle.  And he also
had money in the vehicle.  A lot of what appeared to be
U.S. currency in the vehicle.

Q.    And was there a Youtube or social media post with
him shooting a handgun about that same time?

A.    Yes.  He also posted the next video of himself at
the gun range shooting the weapons to show operability.

Q.    Now, I want to go back, detective.  You have
indicated just a couple minutes ago that you had an
address for Michael Menefield.  What was that address?

A.    The address belonging to Michael Menefield was
19409 Milan, Maple Heights, Ohio.

Q.    And that's set forth in paragraph 12 of your
affidavit, is that not, detective?

A.    Yes.

Q.    And the paragraph above that paragraph 11, what did you indicate there in your affidavit?

A.    In paragraph 11?

Q.    Yes.

A.    That Michael Menefield served his prison time and was released from prison on September 21, 2015.

Q.    In paragraph 12 you indicate that the address of 19409 Milan Drive, Maple Heights, when you drafted this affidavit, that was indicated from his prison release on September 15th, 2015?

A.    Yes.

Q.    And that is what you meant when you drafted this affidavit?

A.    That along with D Fax report other investigative sources that we were able to find that 19409 Milan was his address.

          MR. PATITUCE:    Objection, your Honor. Just for purposes of the record we've never been provided any of these investigative D Fax.

          MR. KIRKLAND:    That's the stuff I gave you.

          MR. PATITUCE:    You're talking about OHLEG.

          MR. KIRKLAND:    There's a D Fax associated with it.

MR. PATITUCE:     OHLEG is fine.

Q.     And based upon this affidavit you attempted to conduct a search at 19409 Milan Drive on April 15th; is that correct?

A.     Yes.

Q.     And you were present when that was conducted?

A.     Yes.

Q.     But the actual search warrant was executed by whom?

A.     It was the SEALE team, Southeast Area Law Enforcement team that conducted the search warrant along with Maple Heights who assisted.

Q.     And as indicated in the search warrant which you were searching for, was criminal gang materials, firearms, records of illegal transactions, personal property, paper, documents, evidence involving criminal gang activities.  Would that be correct without repeating the whole --

A.     Yes, looking for criminal gang materials, evidence of illegal trafficking in firearms and such.

            MR. KIRKLAND:     I have no further questions of this witness, your Honor.

            THE COURT:     Cross-examine.

            MR. PATITUCE:     Yes.

                - - - - -

1        (Thereupon, Defendant's Exhibits A and B

2        were marked for purposes of

3        identification.)

4             - - - - -

5        MR. PATITUCE:    May I approach, your

6   Honor.

7        THE COURT:    You may.

8   CROSS-EXAMINATION OF ALFRED JOHNSON

9   BY MR. PATITUCE:

10  Q.   Your Honor, I am showing the witness what has been

11  previously marked as Defendant's Exhibit A for

12  identification purposes.

13       Detective, can you take a look at Defendant's

14  Exhibit A?

15  A.   Yes.

16  Q.   You're familiar with this form.  This is a CIF

17  form, correct?

18  A.   This is.

19  Q.   Start with page 1.  Page 1 is what?

20  A.   This is Cuyahoga County Metro Housing Authority

21  Police Department complaint.

22  Q.   And it is, just to verify, I'll get my copy back

23  out here.  You see there's a seal on the bottom right

24  hand corner, correct?

25  A.   Yes.

1    Q.    And whose information is listed on this form?

2    A.    This is going to be Michael Menefield.

3    Q.    Does it list an address for Mr. Menefield?

4    A.    Yes.

5    Q.    What address does it list for Mr. Menefield?

6    A.    This address here is 19321 Milan, Maple Heights,

7    Ohio.

8    Q.    Okay.  Now, I want you to go to the second page of

9    this document.  Is there an address listed on the

10   second page of this document for Michael Menefield?

11   A.    Yes.

12   Q.    What address is listed on that?

13   A.    19321 Milan, Maple Heights, Ohio.

14   Q.    So somehow we have two -- is that two different

15   addresses within Maple Heights that Mr. Michael

16   Menefield's is associated with?

17   A.    Yes.

18   Q.    Okay.  Are you aware that the Cuyahoga County

19   docket for all three cases Mr. Menefield has or had

20   open show an address other than 19409 Milan Avenue?

21                   THE COURT:     I'm sorry.  Can you

22        repeat, please?

23   Q.    Are you aware of what the Cuyahoga County Clerk of

24   Courts has listed as Michael Menefield's address?

25   A.    Not if I'm not looking at it right now in front of

1  me, no.

2  Q.   Would it surprise you to know that it's listed as

3  the first address on Defendant's Exhibit A that's what

4  the county has his address listed as being?

5  A.   No, it would not surprise me.

6  Q.   Are you aware that the confidential informant for

7  his case listed an address of 19409 as Mr. Michael

8  Menefield's address?

9  A.   Yeah.  You just showed me the CIF.

10 Q.   So the CIF for this incident has a different

11 address than the address with -- I'll rephrase it.

12      You'll agree with me that on the CIF for this case

13 there's an address not 19409 Milan Ave?

14 A.   Yes.

15 Q.   But 19490 Milan Ave. was the address that was

16 raided.

17 A.   That was the address that the search warrant was

18 conducted at, yes.

19 Q.   I want to focus on your training, your career,

20 your experience as police officer for a moment.  You

21 understand what I'm talking about?

22 A.   Yes.

23 Q.   The prosecution asked you a number of questions

24 regarding your training and your qualifications, right?

25 A.   Yes.

Q.    It's correct that you've been suspended nine times

for violations of departmental policies, correct?

A.    That's incorrect.

Q.    How many times have you been suspended?

A.    I probably -- I'm thinking around three.

Q.    Okay.

          MR. KIRKLAND:    Objection.  Relevancy,

your Honor.

          THE COURT:    Overruled for the moment.

Q.    On January -- was it January 28 2015 you were

suspended for violation of the rules of ethics?

A.    Was that the suspension date or was that the

actual date of occurrence?

Q.    That was when you were suspended for failure to

report or failure to complete a report.

A.    Oh, that actually occurred in the summer before

and the report was actually completed.

Q.    So you were suspended for failure to report

though, correct?  You were actually found guilty I

think was the technical term that the hearing officer

used.

A.    I don't know exactly what they found me guilty

of.  I was accused of a lot of things by the person but

I don't know exactly what at the time -- it was the

safety director, what he found me guilty of.

1  Q.    This is while you were in the gang unit, correct?

2  A.    No.

3  Q.    In 2015 you weren't in the gang unit?

4  A.    I was in the gang unit in 2015 but from my

5  recollection of what you're saying that was while I was

6  in the Fifth District.

7  Q.    Okay.  And there have been other instances where

8  you have been disciplined for either failure to report,

9  use of force, officer safety, leaving your district

10 without authorization --

11             MR. KIRKLAND:    Objection, your Honor.

12             THE COURT:    Overruled at the moment.

13 A.    That was the -- you're listing the offenses of the

14 same thing.  And use of force I don't remember being

15 disciplined for use of force at all.

16 Q.    Okay.  Now, as it relates to Judge Astrab, you

17 were the investigating or one of the investigating

18 officers in the case in which he was the alleged

19 victim, correct?

20 A.    Yes.

21 Q.    Which case was that?

22 A.    Well, while he was conducting the Julius Webster

23 trial, he also received threats.  I was consulted in

24 that so I was also in that invest.

25 Q.    So you were consulted, you weren't the lead

1 investigator?

2 A.   The lead investigator I believe because it was

3 being a judge it would have to be with the sheriff's

4 department.

5 Q.   So you do not necessarily possess all of the

6 information that was obtained in that information

7 regarding the threat?

8 A.   I possess a lot of the information that I can

9 testify to.  If there's something that I don't know

10 about, then I can't testify to that.

11 Q.   What was the nature of the threat?

12 A.   It was actually a letter sent from the jail from a

13 male in a previous trial that was convicted.

14 Q.   What was this individual's name?  Was it Hammonds?

15 A.   I believe it was Hammonds.  His -- I could tell

16 you that the incident was he broke into a female's

17 house in Shaker Heights --

18 Q.   No, I meant the nature of the threat that was made

19 to Judge Astrab.  What specifically was the threat?

20 A.   That they would do something to his child.

21 Q.   They actually had the name of his child, correct?

22 A.   I believe so, yes.

23 Q.   So an individual sitting in prison was able to

24 identify the name of one of Judge Astrab's children.

25 A.   Yes.

Q.    And he conveyed that in a letter form to Judge
Astrab directly?

A.    Yes.

Q.    Okay.  Judge Astrab then reported this conduct,
this threat that he had received, yes?

A.    Yes.

Q.    And prosecution commenced as a result of --

A.    Yes.

Q.    And I believe Hammonds eventually pled guilty?

A.    Yes.

Q.    Admitted that he actually threatened Judge Astrab?

A.    Yes, he pled guilty.

Q.    And Hammonds was a member of the Heartless Felons
as well?

A.    Yes.

Q.    As was the first individual who he was trying, I
forget that person's name that was --

A.    Julius webster.

Q.    So Julius Webster was a member of Heartless
Felons?

A.    Yes.

Q.    Hammonds was a member of the Heartless Felons?

A.    Yes.

Q.    And here with this search warrant you're again
investigating the Heartless Felons?

```
 1   A.    Yes.
 2   Q.    Prior to going to Judge Astrab how many judges did
 3   you go to?
 4   A.    I believe he was the only one that was left that
 5   day so I just went directly to him.
 6   Q.    When you went to him you were aware that he was
 7   the victim of threats from the Heartless Felons?
 8   A.    Yes.
 9   Q.    Have you ever followed Judge Astrab on Facebook?
10   A.    No.
11   Q.    Are you aware of anything that Judge Astrab has
12   said publicly either on Facebook or any social media
13   forum?
14   A.    Only what you just said today.
15   Q.    So outside of the documentation that I have and
16   just the one page that I read you have no knowledge?
17   A.    No.
18   Q.    You're not able to testify as to the impact or
19   effects that the threat had on Judge Astrab?
20   A.    As it relates to this search warrant?
21   Q.    First in general.
22   A.    Right.  First in general I can't tell what he's
23   thinking, no.
24   Q.    Have you ever asked him how the threats made him
25   feel?
```

```
 1  A.    No.
 2  Q.    Okay.  Outside of your going into Judge Astrab's
 3  chambers to have this search warrant signed, have you
 4  ever socialized with him?
 5  A.    Uhm, not really, no.
 6  Q.    And I'm not implying any type of improper
 7  association, but have you ever observed him in his
 8  daily life outside of this instance?
 9  A.    No.
10  Q.    Have you ever -- strike that.
11        I want to talk now about Michael Menefield.  At
12  19409 Milan Drive you never conducted surveillance,
13  correct?
14  A.    That's incorrect.
15  Q.    What surveillance did you conduct?
16  A.    Actually the latest surveillance was the day
17  before I sat outside of his house for approximately two
18  or three hours.  I sat outside of the house at 19409
19  Milan.  We were able to see a male that fit the
20  description but we weren't able to positively ID him as
21  the person as Michael Menefield.
22  Q.    The day before what you sat outside?
23  A.    The day before the search warrant was executed.
24  Q.    Okay.  So the day before the search warrant was
25  executed you conducted surveillance.  What surveillance
```

1    did you conduct before you took this search warrant in

2    to Judge Astrab?

3    A.    The search warrant -- I'm sorry?

4    Q.    Before you took -- when you say the search warrant

5    was executed you conducted surveillance before Judge

6    Astrab signed it or before the search warrant was

7    executed or raided?

8    A.    After he signed it.

9    Q.    So after he signed it you conducted surveillance

10   for the first time?

11   A.    It wouldn't be the first time, no.  I said the

12   last time was right -- the day before we did the search

13   warrant.

14   Q.    Can you indicate in State's Exhibit 1 where it

15   lists out your surveillance of 19409 Milan Drive, Maple

16   Heights there?

17   A.    There's no surveillance of 19409 Milan, Maple

18   Heights in the search warrant.

19   Q.    Why not?

20   A.    Because again, Michael Menefield listed his

21   address as 19409 Milan Avenue; we also had confidential

22   informant information that he lives at that address at

23   19409 Milan and even after we conducted the search

24   warrant, we later find out that he had been put out of

25   19409 Milan Avenue by your client's father.

1    Q.    Where in the search warrant does it indicate a

2    confidential informant told you that Michael Menefield

3    resided at 19409 Milan Avenue?   Where in the search

4    warrant is that?

5    A.    It is not in there.

6    Q.    So that evidence was never presented to Judge

7    Astrab.

8    A.    No.

9    Q.    What type of observations did you make of 19409

10    Milan Drive that led you to conclude that criminal

11    activity was happening inside 19409 Milan Avenue?

12    A.    The Instagram post of Michael Menefield -- I mean,

13    I'm sorry, Michael Menefield, handling the firearm,

14    shooting the AK-47, the continued Instagram post from

15    other members of the Heartless Felons with Milan inside

16    of those posts, throwing out the Heartless Felons hand

17    signs and continuing his association with other

18    Heartless Felons which led us to go into 19409 Milan

19    Avenue looking for criminal gang materials and the

20    firearms.

21    Q.    Okay.   So the only evidence you had -- in your

22    opinion the only evidence that you had was social media

23    posting?

24    A.    No.

25    Q.    What other evidence did you have that there was

1  criminal activity in 19409 Milan Avenue?

2  A.    Again we can start with the posting.  Well, we can

3  also start with his association with other members of

4  the Heartless Felons gang.  We can start with -- we can

5  go into having used these postings before and gone into

6  these homes to find multiple firearms and even once we

7  did the search warrant into this house we found

8  multiple firearms.

9  Q.    Okay.  So now that I have an understanding, let's

10 start with the social media posts.  Are you suggesting

11 to the Court that Michael Menefield -- on just dealing

12 with what's in the warrant, with What's in the warrant,

13 Michael Menefield at a gun range is going to indicate

14 that he's got a gun at 19409 Milan Avenue?

15 A.    That's evidence.  Not just the fact that he's --

16 Q.    We're going through piece by piece.

17 A.    You asked me the question.  I'm trying to answer

18 it.

19 Q.    The fact that he is firing a gun at a gun range

20 indicates that he's going to put a gun in 19409 Milan

21 Drive?

22 A.    Not just that.  Again it's his transporting the

23 gun to the firing range and then shooting the gun.  And

24 at this firing range you can't -- they -- you don't

25 take a gun away from a firing range unless you purchase

1  one.

2  Q.    You can't -- he was at the firing range in what

3  month of what year?

4  A.    This was -- again I've got to go back to Exhibit

5  1.  April 9th, 2016.

6  Q.    So on April 9, 2016 you then had an arrest warrant

7  drafted for Michael Menefield because he's a felon in

8  possession of a firearm, correct?

9  A.    No.

10  Q.    Why not?

11  A.    Because the charge would actually be improper

12  handling of a firearm in a motor vehicle.

13  Q.    So you got a warrant for that?

14  A.    No, we got a search warrant for the firearms.  In

15  the criminal gang materials that would be associated

16  with the Heartless Felons gang.

17  Q.    Without personally identifying Michael Menefield

18  is actually living at that address.

19  A.    Well, Michael Menefield personally identified

20  himself as living at that address.

21  Q.    So the answer was no, you did not personally

22  identify him living at that address.

23  A.    He personally identified himself which makes that

24  a personal identification for me.

25  Q.    Detective, did you go to 19409 Milan Drive and

1  personally observe him residing in the house?

2  A.   I don't know how to answer that question as to how

3  can you personally --

4  Q.   Did you see --

5  A.   I observed the male that fit the description going

6  in and out of the house.

7  Q.   You said fit the description.  Was that Michael

8  Menefield or not?

9  A.   Again, I don't know if it was -- I can't say that

10  it was Michael Menefield, I can say that he fit the

11  description going in and out of the house.

12  Q.   You said that Michael Menefield is in these

13  videos.  Was Michael Menefield in the videos or not?

14  A.   Yes.

15  Q.   So you know what Michael Menefield looked like but

16  you wouldn't identify the person coming out of the

17  house as being Michael Menefield?

18  A.   The way surveillance works unless I was -- the way

19  this house was situated looking at the house, looking

20  at the driveway, looking at the driveway next to the

21  house, which they were also using, you could see people

22  but I couldn't put binoculars on the person to actually

23  identify the face because of the way the street was.

24  Q.   How about trash pulls?  How many trash pulls did

25  you do in 19409 Milan Avenue or mail pulls did you do

1  to verify his --

2  A.    We did that through D Fax.

3  Q.    So the answer was you did no trash pulls or no

4  mail pulls?

5  A.    You asked me about mail pulls.  D Fax gives you

6  mail and whose name is on the bills and it gives the

7  address of the person that goes to that house.

8  Q.    Does that establish somebody lives there?  If I

9  put my address on my brother's -- if I use my brother's

10  address for mail does that mean I live there?

11  A.    That means that you frequent that -- you frequent

12  that enough to go get your mail from that house which

13  it proves the point to me that if you use that address

14  you have personal property there.  That personal

15  property would be in your mail.

16                       - - - - -

17        (Thereupon, a discussion was had off the

18        record.)

19                       - - - - -

20  Q.    So you did not physically remove any trash or any

21  mail from 19409 Milan Avenue, physically yourself

22  remove anything from that address?

23  A.    Yeah, I removed mail after the search warrant with

24  Michael Menefield's name on it.

25  Q.    Prior to the search warrant what did you remove

1  from the address?

2  A.     Again, we does not do a trash pull.

3  Q.     Aside from social -- now social media, so you went

4  out and obtained a search warrant for the IP addresses.

5  A.     For the social media accounts, correct.

6  Q.     Search warrants were obtained?

7  A.     Yes.

8  Q.     Were the search warrants obtained prior to -- did

9  you know about this -- and the search warrant for the

10 IP addresses showed that those social media it doesn't

11 go back to 19409 Milan Drive, did it goes back to a

12 different address?

13 A.     That would be something that you -- I don't have

14 that information, no.

15 Q.     You said you obtained a search warrant for the

16 social media accounts relating to Michael Menefield?

17 A.     Yes.

18 Q.     Those social media accounts search warrants

19 presented an IP address Internet protocol address?

20 A.     It is when you get social media results there are

21 multiple IP addresses and IP addresses can be a phone,

22 IP addresses can be a computer, and usually when this

23 comes to Instagram all of time when it comes to

24 Instagram when you're posting you're posting from a

25 mobile device which means the IP address is not a fixed

1  location.

2  Q.   Would you agree with me not once did one of

3  Michael Menefield's social media accounts ping off of

4  19409 Milan Avenue?

5  A.   No.

6  Q.   How many times?

7  A.   You asked would I agree with you.  He actually has

8  pictures of himself in the house of 19409 Milan

9  Avenue.  It's provided to you when the Instagram.

10             MR. PATITUCE:    Your Honor, I believe

11        the prosecution for this point would agree with me

12        there's no pictures of Mr. Menefield.

13             MR. KIRKLAND:    They're not in my

14        possession.  What I have is what you know of video

15        and the firearm range.

16  Q.   Does it surprise you to know that the prosecution

17  is not in possession of any photographs of Michael

18  Menefield inside 19409 Milan Drive?

19  A.   That surprises me because you guys are -- as you

20  stated aware of the Instagram account of Michael

21  Menefield and on his Instagram account there's pictures

22  of him in a bedroom at 19409 Milan Avenue.

23  Q.   So you can tell by looking at Instagram postings

24  that he is in the bedroom just by looking at someone

25  has a photo of a bed, you instantly knew that was 19409

1    Milan Avenue?

2    A.    No.

3    Q.    Going back to State's Exhibit 1, do you agree with

4    me that paragraphs 3, 4, 5, 6, 7, 8, 9, and 10 all deal

5    with conduct happening in 2014?

6             THE COURT:    What are the paragraph

7        numbers?

8             MR. PATITUCE:    Three through ten,

9        your Honor.

10            THE COURT:    Thank you.

11   A.    Yes.

12   Q.    And just so we have chronological clarity here

13   perhaps one and two are just general paragraphs.

14   A.    Yes.

15   Q.    Paragraphs 11, 12, 13, 14, 15, deal with conduct

16   that happened in 2015.

17   A.    Yes.

18   Q.    Coming back to paragraph 16 and 17.  Then I want

19   to direct your attention to paragraphs 18, 19, 20, 21,

20   22 and 23 as well as 24 and 25.  None of those

21   paragraphs have any facts specific to this case.  These

22   are generalized or specialized knowledge regarding the

23   Heartless Felons and your experience.  Correct?

24   A.    These specifically outline what we're going to be

25   looking for and why we're going to look for them.

Q.    Okay.  But they're not -- they're general in
nature because you use these exact paragraphs in other
search warrants.

A.    Yes.

Q.    Paragraphs 18 through 25, again these are general
paragraphs that you use in your Heartless Felons
investigations.

A.    Yes.  Not just Heartless Felons but gang
investigations.

Q.    Sure.  And paragraphs one and two would fall into
that same category but those would be specific to the
Heartless Felons.

A.    Yes.

Q.    So when we're dealing with the face of the search
warrant, we're really talking about unique paragraphs
are paragraphs three through 17.  Those are unique to
this investigation.

A.    Yes.

Q.    Okay.  And then again just dealing with the face
of the search warrant, the only two paragraphs out of
the 25 that deal with any conduct happening in 2016
would be paragraph 16 and paragraph 17.

A.    As in -- to answer that -- well, as in the date on
these would be 2016.

Q.    That's what I'm talking about.  And this is the

1  information you provided to Judge Astrab.  You didn't

2  provide information outside of these ten paragraphs,

3  excuse me, 25 paragraphs, did you?

4  A.    Just what the photos that you have.

5  Q.    Okay.  So then we have the paragraph 16 and

6  paragraph 17 dealing with 2016 conduct, that's conduct

7  allegedly of Michael Menefield, correct?

8  A.    Yes.

9  Q.    Michael Menefield's never been convicted of a

10  crime out of the conduct in these two paragraphs,

11  right?

12  A.    Not yet.

13  Q.    Paragraph 16 is a video of Mikey 216 on April 9th,

14  2016 driving a vehicle with four different guns and it

15  said folded U.S. currency?

16  A.    Yes.

17  Q.    So he's driving a gun at the time?  I am sorry.

18  So he's driving a car at that time?

19  A.    Yes.

20  Q.    So he's not at 19409 Milan Avenue at that time?

21  A.    No.

22  Q.    Paragraph 17, that's April 9, 2016.  Again under

23  Mikey 216 has shooting a firearm at a gun range?

24  A.    Yes.

25  Q.    There is no firearm at 19409 Milan Avenue, is

1  there?

2  A.    There's multiple firearms at 19409 Milan Avenue.

3  Q.    Gun range.

4  A.    No, there's no gun range.

5  Q.    So the conduct in paragraph 17 is not happening at

6  19409 Milan Avenue.

7  A.    No.

8  Q.    So, for the two paragraphs in the affidavit that

9  deal with conduct that happened in 2016, specific

10  conduct, there's nothing that's happening at 19409

11  Milan Avenue in 2016 in this affidavit that's

12  specifically identified.

13  A.    That's not true.  Michael Menefield lists his

14  address as 19409 Milan Avenue in 2016.

15  Q.    Is it criminal to list his address?

16  A.    No, it's just self-admission that you live there.

17  Q.    So, what we have is we have Michael Menefield list

18  his address, allegedly list his address as 19409 Milan

19  Avenue, right?

20  A.    No.  He listed his address as 19409 Milan Avenue.

21  Q.    Even though there are county records that dispute

22  that.

23  A.    You gave me his records from 2012.

24  Q.    Are you familiar with what the clerk of courts

25  currently has listed as his address?

1  A.    No.

2  Q.    You did actually look at the clerk of courts to

3  see what his address is listed because you knew he had

4  priors, right?

5  A.    Yes, I listed priors in there so I looked at the

6  Clerk of Courts.

7  Q.    And I don't know if the prosecution is willing to

8  look at it.  Are you willing to stipulate?

9             MR. KIRKLAND:    Willing to stipulate

10        that there's a different address on the clerk of

11        courts?  I don't know that.

12             MR. PATITUCE:    May I have a moment,

13        your Honor?

14             THE COURT:    You may.

15             MR. PATITUCE:    Your Honor, may I

16        approach?  I only have one copy of this but this

17        will be Defendant's Exhibit B.

18  Q.    Showing the witness what has been previously

19  marked as Defendant's Exhibit B, you recognize this as

20  a complaint summary form, correct?

21  A.    Yes.

22  Q.    And it's from this case, correct?

23  A.    Uhm.

24  Q.    From the same day, same location that my client is

25  charged?

A.   Yes.

Q.   And what's the address that is listed for Michael Menefield on this document?

A.   On this it's 19321 Milan, Maple Heights, Ohio.

Q.   Not 19409 Milan Avenue?

A.   No.

Q.   How often have you used the confidential informant -- without identifying who he is, how long have you used the confidential informant that allegedly told you Michael Menefield lived at this address?

A.   This was twice.  Well, actually it would be three times now.

Q.   Today or at the time of the search warrant?

A.   At the time of the search warrant it would be the third time.

Q.   Okay.  And it's not related -- his reliability is not indicated anywhere in your search warrant affidavit, correct?

A.   We just labeled him as a CI right now, confidential informant.  It's not a confidential reliable informant, no.

Q.   And there's a difference between a confidential informant and a confidential reliable informant?

A.   Correct.

Q.   What is that difference?

1  A.    The difference is the amount of time we've used

2  him and found the information to be again reliable.

3  Q.    And often confidential informants are people who

4  you have perhaps either arrested or have evidence of

5  wrongdoing who are trying to help themselves?

6  A.    Yes.

7  Q.    So this is a confidential informant this is not

8  somebody who you've used long enough to determine a

9  confidential reliable informant.

10  A.    Correct.

11  Q.    And again nothing in this affidavit indicates that

12  the confidential informant alleged Michael Menefield

13  lived at 19409 Milan Avenue.

14  A.    That's not in the affidavit, no.

15  Q.    Nothing in this affidavit suggests that the

16  confidential informant indicated Michael Menefield was

17  running guns or bringing guns to and from 19409 Milan

18  Avenue.

19  A.    That's not true.  It says information received

20  through confidential informant states the AK-47 was

21  obtained from Michael Menefied and that Michael

22  Menefield supplies weapons for the members of the

23  Heartless Felons.

24  Q.    Okay.  Nothing in here said that he is storing

25  those weapons at 19409 Milan Avenue.  Nothing from this

1  paragraph says that.

2  A.    No.

3  Q.    Nothing from the confidential informant in the

4  affidavit says that?

5  A.    In the affidavit, no.

6  Q.    So again the three out of the 25 paragraphs, only

7  three of the paragraphs touch on conduct that happened

8  in 2016.   Correct?

9  A.    As 2016?

10  Q.    Yes.

11  A.    Yes.

12  Q.    The paragraph that states Michael Menefield listed

13  his address at 19409.

14  A.    Yes.

15  Q.    And Michael Menefield possessed a picture or

16  Instagram account of himself in a vehicle with guns?

17  A.    Yes.

18  Q.    And the vehicle was actually moving at the time,

19  right?

20  A.    Yes.

21  Q.    And next was Mr. Menefield at a firearms range.

22  A.    Yes.

23  Q.    There's no 2016 -- in the search warrant, there's

24  no 2016 Instagram account, Facebook post or any form of

25  social media showing Mr. Menefield at any of those two

1  locations.

2  A.    In the search warrant, no.

3  Q.    So you agree with me that on the face of the

4  search warrant in 2016, going from just the search

5  warrant, there's no evidence that Michael Menefield in

6  2016 had firearms at that location.

7  A.    No, I wouldn't agree with you.

8  Q.    Okay.  Which paragraph indicates that he possessed

9  video of himself at Milan Drive?  Which paragraph?

10  A.    If you're going to ask me -- there's not going to

11  be a paragraph that says that, but you asked me did I

12  agree with you and I said no, I did not agree with you

13  that the information does not lead to that.

14  Q.    In 2016, in this affidavit for 2016, there's not a

15  single paragraph that says in 2016 that Mr. Menefield

16  had a firearm in 19409 Milan Avenue.

17  A.    Okay, so in 2016.

18  Q.    2016.

19  A.    This is -- okay for the fourth time it does not

20  say that he has a firearm at 19409 Milan Avenue.

21  Q.    Okay.  And just so I'm clear the search warrant it

22  was signed and executed in April of 2016?

23  A.    Yes.

24  Q.    Okay.  So for at least four months, April, there's

25  four months in April, four months, there's nothing in

1 this affidavit for the four months showing video or

2 firearms at 19409 Milan Avenue.

3 A.    No.

4              MR. PATITUCE:    Thank you.  No further

5      questions.

6              THE COURT:    We're going to take a

7      short ten-minute break.  Let's talk a little bit

8      about scheduling and then we'll take a break.

9              How many witnesses do you have,

10     Mr. Kirkland?

11             MR. KIRKLAND:    One more.

12             THE COURT:    One more.  And do you

13     anticipate his direct to be similar to --

14             MR. KIRKLAND:    No, I think it's going

15     to be very brief, your Honor.

16             THE COURT:    Very brief?

17             MR. PATITUCE:    I agree.

18             Are you going to redirect?

19             MR. KIRKLAND:    Maybe a little bit.

20             THE COURT:    Take a ten-minute break

21     and we'll continue on.

22                      - - - - -

23             (Thereupon, a recess was taken.)

24                      - - - - -

25             THE COURT:    We're back on the record.

1    All right.  We're back on the detective.  Is it

2    Johnson or Johnston?

3              THE WITNESS:  Johnson.

4              THE COURT:     Is back on the

5    stand.  And we'll continue the cross-examination.

6              MR. PATITUCE:     Actually, your Honor,

7    I believe I concluded cross-examination; however

8    the prosecution and I had discussed the matter

9    outside of -- at the break and we had a

10   stipulation that the Cuyahoga County Clerk of

11   Courts in Case Numbers 568451 and 58808 -- 008,

12   excuse me, 605515 for Michael Menefield for years

13   2012, 2014 and 2016, has listed the address of

14   19321 Milan Drive in Maple Heights.  And that was

15   going to be a stipulation that that's the record

16   contained by the Cuyahoga County Clerk of Courts.

17             THE COURT:     State in agreement to

18   that proposed stipulation?

19             MR. KIRKLAND:     That's accurate.

20             THE COURT:     That's accepted for the

21   record.  Go ahead.

22             MR. PATITUCE:     Thank you.  And as I

23   said, I concluded my cross.

24             THE COURT:     Thank you.  Redirect.

25        REDIRECT EXAMINATION OF ALFRED JOHNSON

BY MR. KIRKLAND:

Q.   Detective, as set forth in your affidavit, State's Exhibit 1, the defense went through a number of paragraphs in here and took them individually shall we say and went through them and indicated that they did not indicate specifically that whether Michael Menefield had weapons at the 19409 Milan Drive.

Now, taking the affidavit as a whole, okay, without trying to say one particular paragraph indicates something, taking it as a whole was it your belief when you drafted this that he resided at 19409 Milan Avenue?

A.   Yes.

Q.   And was it your belief based upon all the paragraphs and I'll summarize this a little more, that going back to 2014 this largely relates to paragraphs three through ten, that Daryl Patton was a member of the Heartless Felons and had automatic weapons and other weapons, correct?

A.   Yes.

Q.   And that on August 1st of 2014 he was arrested along with Michael Menefield with weapons in a vehicle; is that correct?

A.   He was actually not arrested but he was in the vehicle.

Q.   Michael Menefield was with him and he was
arrested, is that accurate?

A.   Yes.

Q.   And that led to the conviction for the improper
handling of firearms in a motor vehicle of Michael
Menefield.

A.   Correct.

Q.   And that thereafter when he got out in September
of 2015, he was associated with Marvin Linder?

A.   Correct.

Q.   And that when you did a search warrant in November
of 2015, you recovered an AK-47 which was fully
automatic along with other weapons?

A.   Yes.

Q.   And that your information was that Michael
Menefield was involved in obtaining or giving
Mr. Linder again a Heartless Felons member that AK-47;
is that correct?

A.   Yes.

Q.   And so up until that point you have a history
again taken in total of the circumstances not
individual paragraphs that Mr. Patton was a member of
the Heartless Felons and Mr. Michael Menefield was
associated with them, correct?

A.   Yes.

1  Q.   And that he was involved with weapons and in fact

2  Michael Menefield went to prison for improper handling

3  of a firearm?

4  A.   Correct.

5  Q.   And when he got out he was associated with

6  Mr. Linder another Heartless Felons investigation of

7  yours again involving weapons; is that correct?

8  A.   Yes.

9  Q.   And that was November of 2015.  Moving forward is

10  when you had the Instagram videos with him with guns in

11  April of 2016, correct?

12  A.   Yes.

13  Q.   And actually in November not only Marvin Linder

14  was in the house but Daryl Patton was also in the

15  house, again from the previous investigations?

16  A.   Yes.

17  Q.   Again more Heartless Felons.  And then your

18  information was that when he was released in September

19  of 2015, he utilized the 19409 Milan Drive address?

20  A.   Yes.

21  Q.   Correct.  So taking in the totality of

22  circumstances when you went to get this search warrant

23  with this affidavit it was your belief that there was

24  probable cause to believe there were weapons and other

25  Heartless Felons evidence connected with Michael

1  Menefield and he was connected to 19409 Milan Avenue,

2  correct?

3  A.    Yes.

4  Q.    In your -- we just talked about briefly about

5  prior investigations or prior cases with Michael

6  Menefield, one in 2012 and I believe the other one was

7  2014, is that correct, counsel, where he utilized the

8  address of 19409 Milan Avenue; is that correct?

9  A.    Yes.

10 Q.    There was also reference to this particular case

11 where the Clerk of Courts has him at a different

12 address at the same address on Milan Avenue but at the

13 time you obtained the search warrant, not afterwards

14 but at the time you obtained the search warrant, the

15 facts you had in your possession you believe he was at

16 19409 Milan Drive?

17 A.    Yes.

18 Q.    It was not until after the raid that you had

19 determined that he had he left and that what set forth

20 on the -- I believe counsel called it CIF and also the

21 Clerk of Courts provided that 19321 address; is that

22 correct, officer?

23 A.    Yes.

24 Q.    Now, is it unusual in your experience -- how long

25 have you been a detective and police officer?

```
1   A.    Police officer since 2007, detective since 2013.
2   Q.    And in your experience is it unusual for
3   individuals being investigated to use addresses other
4   than -- more than one address?
5   A.    Yes.
6              MR. KIRKLAND:     No further questions,
7         your Honor.
8              THE COURT:     Recross.
9              MR. PATITUCE:     Thank you.
10             I want to make sure that I understand the
11        last question.
12             RECROSS-EXAMINATION OF ALFRED JOHNSON
13  BY MR. PATITUCE:
14  Q.    Is it usual or unusual for people involved in
15  gang-related activity to use multiple addresses?
16  A.    It's common.
17  Q.    It is common.   Okay.   So it's common -- why is it
18  common?
19  A.    Because usually they're conducting or being
20  involved -- if I'm looking at them they're involved in
21  illegal activity so they're trying to not show us where
22  they're going to be living at.
23  Q.    So the purpose of using multiple addresses is to
24  draw your attention away from where they really are.
25  A.    Correct.
```

1  Q.. And it's your testimony and you said this in the

2  search warrant that he outwardly listed his address as

3  being 19490 Milan Drive.

4  A.  Yes.

5  Q.  Following your logic about his address at 19409

6  Milan Avenue, isn't it likely that he was storing these

7  weapons at another location?

8  A.  That's not following my logic, that's following

9  your logic, sir.

10  Q.  So he publicly listed -- according to you he

11  publicly listed his address as 19409 Milan Avenue.

12  A.  Yes.

13  Q.  Okay.  The AK-47 that we saw in 2015 in October of

14  2015 that was recovered by you in November -- excuse

15  me, November 22, 2015, right?

16  A.  I'm sorry.  What was that again?

17  Q.  Your testimony is you saw Michael Menefield firing

18  an AK-47 on his Instagram account and that was dated

19  October, excuse me, September 20, 2015; is that

20  correct?

21  A.  Yes.

22  Q.  And September 20, 2015, and this is in paragraph

23  16, you said it was seized.

24  A.  Yes.

25  Q.  So the AK-47 was removed from the picture in 2015?

1 A.    Yes.

2 Q.    So you further testified that after that the

3 affidavit only has two more Instagram videos, one

4 involving him driving a car and the other again of him

5 shooting at a gun range, correct?

6 A.    That's a very limited -- no, it involves him

7 driving a car, handling firearms and having guns and

8 him taking those same guns to a gun range showing the

9 operability.

10 Q.    That's the same day?

11 A.    Yes.

12 Q.    So the guns in the car and the guns at the gun

13 range are both on that April 9, 2016?

14 A.    Yes.

15 Q.    So in January of 2016 -- from January 1, 2016

16 through April 9th of 2016, there is only one day in the

17 search warrant where you observe Michael Menefield in

18 possession of firearms.

19 A.    In the search warrant, yes.

20 Q.    No other evidence in the search warrant from

21 January 1st 2016 through April 9th 2016 that Michael

22 Menefield had actual firearms in his possession in the

23 search warrant.

24 A.    No.

25 Q.    Okay.  Now, we can back that up.  The last date I

1  believe the search warrant -- again please correct me
2  if I'm wrong, the last date that you have in your
3  search warrant where Michael Menefield was observed
4  having firearms aside from the April 9th date is
5  October 22, 2015.  And I believe that's paragraph 13.
6            MR. KIRKLAND:    Your Honor, we've gone
7        through all this on the first time on
8        cross-examination.  I don't think we have to go
9        through it again.
10           THE COURT:    I'll overrule it.  Go
11       ahead.
12  A.    So, October -- October 22nd there was posted a
13  video of Michael Menefield showing him firing a weapon,
14  an AK-47.
15  Q.    So October 22 there's a video showing him firing
16  an AK-47.  Where was he firing the AK-47?  Was it in
17  the street, firing range?
18  A.    He was at a firing range.
19  Q.    So this isn't Michael Menefield with a AK-47
20  inside a house?
21  A.    No.
22  Q.    Then again paragraph 16 and paragraph 17 involves
23  him with guns neither in a vehicle or guns at a firearm
24  range.
25  A.    Yes.

Q. There is no paragraph inside the face or four
corners of the search warrant that indicate he took a
photograph or some Instagram account of him with the
guns inside a house?

A. No.

Q. Okay. Now, you testified that the totality of the
circumstances is what leads you to believe that you had
probable cause and it seems to me that it's important
that he listed or allegedly listed his address at
19409.

A. Yes.

Q. Now you've heard the stipulation between the
parties that over the three year period he has listed
addresses with the county or the county has his address
as being 19321 Milan Drive?

A. Yes.

Q. Did you ever research that that he possibly was
living at 19321 Milan Drive?

A. Yes.

Q. What steps did you take to research that?

A. Again when I spoke to the confidential informant
he actually pointed out which house that he's actually
living in. Because I stated before in my testimony
there were several houses on Milan Drive associated
with Michael Menefield and his family. So we had to

1  decide which house was actually his.

2  Q.  And that information you just testified to that is

3  not contained within the search warrant.

4  A.  Correct.

5  Q.  Okay.  That's actually not contained within any

6  police report, is it?

7  A.  There's video of it but it's not -- it wasn't

8  germane to this -- this was for Michael Menefield.  We

9  weren't charging Mr. Carr with anything from Cleveland

10  so we --

11          MR. PATITUCE:     Can we approach?

12          MR. KIRKLAND:     Yeah.

13          MR. PATITUCE:     Your Honor, can we

14      approach?

15          THE COURT:     Yes.

16             - - - - -

17          (Thereupon, a discussion was

18          had between Court and counsel at

19          sidebar.)

20             - - - - -

21          THE COURT:     Continue.

22          MR. PATITUCE:     Thank you, your Honor.

23  BY MR. PATITUCE:

24  Q.  Sorry.  I was just collecting my train of thought.

25  19321 Milan Drive is not mentioned at all in the search

1  warrant or search warrant affidavit, correct?

2  A.   Correct.

3  Q.   None of the other addresses that you just

4  referenced, you mentioned that this family has other

5  addresses on the street and none of those addresses are

6  referenced in this search warrant.

7  A.   Correct.

8  Q.   Did you ever inform Judge Astrab that there were

9  other addresses on the very same street that were

10  associated with Michael Menefield?

11  A.   Judge Astrab only had what was in the search

12  warrant and when he looks at the search warrant he

13  reads each individual paragraph at a time and he

14  marked -- I don't know if he marks it in his head but

15  he reads each individual paragraph and goes from the

16  beginning through the end even correcting mistakes that

17  we may have missed in spelling.

18  Q.   Okay.  So the answer was no, that those addresses

19  weren't presented to Judge Astrab.

20  A.   No.

21              MR. PATITUCE:    Thank you.  No further

22       questions.

23              MR. KIRKLAND:    Nothing further, your

24       Honor.

25              THE COURT:    I have a

1    question.  Detective, I'm sure you've mentioned it

2    but I just want to clarify it for my

3    understanding.

4              When was the last time period that you

5    understood Michael Menefield was living at or you

6    believe weapons were stored at 19409 -- the

7    address we've been focusing on as a result of this

8    search warrant?

9              THE WITNESS:    This had to be

10   approximately January of 2016.

11             THE COURT:    And what was based on

12   the -- what fact occurred in January of 2016 that

13   led you to believe that Michael Menefield was

14   connected to that address?

15             THE WITNESS:    We ran the D Fax report.

16             THE COURT:    The what report?

17             THE WITNESS:    It's a D Fax.  It's a

18   report which lists everything that's associated

19   with a male's name.  It goes into bills, mail --

20             THE COURT:    So is it fair to say that

21   it's a database that you have access to that

22   enables you to make connections between a person

23   of interest and another where they might be

24   residing or located?

25             THE WITNESS:    Yes.

1          THE COURT:     And what was the results

2    of that report concerning  Michael Menefield?

3          THE WITNESS:  The result of that report

4    is that we found -- we found not found but it came

5    back to the listed address of 19409 Milan.   There

6    were multiple addresses listed from past and the

7    most current that we could find was 19409 Milan.

8          THE COURT:     And was there anything

9    from January 2016 until the search warrant was

10   presented to Judge Astrab to lead you to believe

11   that that address was no longer connected to

12   Michael Menefield in the manner in which you

13   thought it was in January of 2016?

14         THE WITNESS:  Actually you know what I

15   think we did it again in April of 2016.

16         THE COURT:     And did you get the same

17   result?

18         THE WITNESS:  Yes.  Before the search

19   warrant was written.

20         THE COURT:     And do you have

21   documentation as to the results of that report?

22         THE WITNESS:  Yes.  I provided them to

23   the prosecutor.

24         THE COURT:     And has that been

25   submitted in discovery?

MR. KIRKLAND:    I should have it, your
Honor.

THE COURT:    If I'm pronouncing it
correctly, the D Fax report?

And based on these two records, one in
January and one in April, did you use that address
for purposes of preparing your search warrant?

THE WITNESS:  Yes.

THE COURT:    Based on the information
available to you on or about the time you prepared
this report of the search warrant, did you have
any other address that you thought was connected
to Michael Menefield or where he may have been
storing weapons?

THE WITNESS:    There were other
addresses on Milan that was connected -- that were
connected, but that again was the latest one we
had, and based on this confidential informant
information also that he lived there, that that
was the house that he lived in.

THE COURT:    And how recent -- because
the information -- let me put it this way.  When
you talked to the confidential informant about
Michael Menefield's location, what was the latest
date that the confidential informant provided you

```
1        as to when he believed Michael Menefield was
2        living there or connected there by way of weapons
3        or otherwise?
4                THE WITNESS:    I believe the latest
5        date would have been either December of 2015 or
6        January of 2016.
7                THE COURT:    Thank you.
8                Any follow-up by the State on those
9        questions?
10               MR. KIRKLAND:    None, your Honor.
11               THE COURT:    Any follow-up by the
12       defense regarding those questions?
13               MR. PATITUCE:    Can I have just one
14       moment, your Honor?  I apologize.
15               THE COURT:    Sure.
16           FURTHER RECROSS-EXAMINATION OF ALFRED JOHNSON
17  BY MR. PATITUCE:
18  Q.    Detective, I just want to make sure I understood
19  correctly.  You said last time you had evidence that
20  guns may have been at 19409 Milan Drive was January
21  2016?
22  A.    No, I didn't say that.
23  Q.    What did you say?
24  A.    He asked me where did we get the address from.  Is
25  that what we're speaking of, what your Honor asked?
```

1  Q.    No.   You made a comment relating to when is the

2  last time you had a video of a firearm in 19409 Milan

3  Drive.   When is the last one?   I'll just ask it that

4  way.

5  A.    And I said I didn't have -- I did not have

6  Milan -- I mean, I'm sorry, Michael Menefield in 19409

7  Milan with a weapon.

8  Q.    So you did not have a photograph of Michael

9  Menefield in 19409 Milan Avenue with a weapon.   That's

10 what you just said.

11 A.    Yes.

12              MR. PATITUCE:     No further questions.

13              THE COURT:     I'm sorry.   You said you

14      did not have a photo?

15              THE WITNESS:     Right.   I did not.

16              MR. PATITUCE:     Thank you, your Honor.

17              THE COURT:     Did you have any

18      photographic information either videotape or still

19      photos that you believed placed him at that

20      address?

21              THE WITNESS:     Yes.   It was on the

22      Instagram account in the bedroom.   But again only

23      way I could verify that was once we went inside

24      the house.

25              THE COURT:     And when did you have

1    that Instagram depiction of that bedroom?

2            THE WITNESS:    This was sometime in

3    2015 I believe but I'm not sure exactly when.

4            THE COURT:    And did that Instagram

5    photograph play any role in your decision or your

6    belief that Michael Menefield was associated with

7    this address at 19409?

8            THE WITNESS:    Yes.

9            THE COURT:    But was that in

10   connection with all the other information that you

11   mentioned with regard to the D Fax report?

12           THE WITNESS:    Yes.

13           THE COURT:    Any follow-up by either

14   side?  State?

15           MR. KIRKLAND:    Nothing by the State,

16   your Honor.

17           THE COURT:    Defense?

18           MR. PATITUCE:    Just one question.

19       FURTHER CROSS-EXAMINATION OF ALFRED JOHNSON

20   BY MR. PATITUCE:

21   Q.   This testimony or statement regarding a photograph

22   of a bedroom inside 19409 Milan Avenue, that's not in

23   the search warrant at all, is it?

24   A.   No.

25           MR. PATITUCE:    Thank you.  No further

1    questions.

2              THE COURT:      If nothing else of the

3    detective, you're released.  Watch your step.

4    There are two steps down.

5              THE WITNESS:      Thank you, your Honor.

6              THE COURT:      Call your next witness.

7              MR. KIRKLAND:      Your Honor, the State

8    will call Detective Tom Halley from Maple Heights

9    Police Department.

10             -- - - - -

11        The STATE OF OHIO, to maintain the issues on

12   its part to be maintained, called as a witness,

13   TOM HALLEY, who, being first duly sworn, was

14   examined and testified as follows:

15             THE COURT:    State your name for the

16   record.

17             THE WITNESS:      Tom Halley. H-A-L-L-E-Y.

18             DIRECT EXAMINATION OF TOM HALLEY

19   BY MR. KIRKLAND:

20   Q.   I believe he's already spelled his name for the

21   record.

22        So, sir, where are you employed?

23   A.   Maple Heights Police Department.

24   Q.   And what's your current capacity or job there?

25   A.   Detective.

Q.    How long have you been a detective?

A.    Since February of this year.

Q.    And how long have you been employed by the Maple
Heights Police Department?

A.    14 and a half years, almost 15.

Q.    And I want to draw your attention to the events of
April 15th of this year.

      Were you involved at all in the execution of a
search warrant at 19409 Milan Avenue in the City of
Maple Heights?

A.    Yes.

Q.    And could you briefly explain how you and your
department became involved in that matter?

A.    The Cleveland Gang Unit asked our command staff if
they would -- we would assist them in executing a
search warrant in the city, also asked for the use of
Southeast Area Law Enforcement SWAT team.  It was
approved and on the day in question we met at the
station, were briefed in the basement, and then
proceeded over to the house.

Q.    Sir, are you familiar with Michael Menefield?

A.    Yes.

Q.    Were you familiar with him before this event?

A.    I think from as a juvenile years ago in patrol.

Q.    In connection with this particular event, were you

1  advised what was being sought or searched for?

2  A.    No, I wasn't.

3  Q.    Did your department conduct any actual

4  investigation?

5  A.    No.

6  Q.    Okay.  What was the role of your department and

7  SEALE to the best of your knowledge in this

8  investigation?

9  A.    The SWAT team was to execute getting into the

10  house and then Cleveland gang unit was going to take

11  over the search and we were, as detectives, just to

12  basically assist on the perimeter, block traffic, you

13  know, provide any assistance we can.

14  Q.    Would it be accurate to say your department

15  conducted no investigation into this matter prior to

16  this date?

17  A.    No.

18  Q.    And did you rely on the search warrant that was

19  obtained to execute at 19409 Milan Avenue?

20  A.    Yes.

21  Q.    But that was not obtained by your department, it

22  was obtained by --

23  A.    By Cleveland Gang Unit.

24  Q.    And other than your assistance on that day, your

25  officers and the officers of SEALE had no active

1  investigation into this matter?

2  A.    No.

3          MR. KIRKLAND:    Thank you.  No further

4     questions.

5          MR. PATITUCE:    Thank you, your Honor.

6          CROSS-EXAMINATION OF TOM HALLEY

7  BY MR. PATITUCE:

8  Q.    Detective, it's my understanding that on the date

9  that the search warrant was executed you took up a

10 position on Milan Avenue.

11 A.    Yes.

12 Q.    What position did you take up?

13 A.    I was on Milan approximately three to four houses

14 down in front of the previous address where the Carrs

15 used to live in case --

16 Q.    They use to live there?

17 A.    There was a concern throughout SEALE -- I don't

18 mean necessarily --

19 Q.    You were worried there was a possibility that he

20 might be in 19321 Milan?

21 A.    Yeah, because they're two houses next to each

22 other that the family used to live in.

23 Q.    Sure.  In fact Mr. Derrick Carr used to own --

24 prior to the housing bubble collapse -- used to own

25 multiple house on that street.

A.    I just know of just two.

Q.    And two houses were known to the police at the

time that the search warrant was executed?

A.    Correct.

Q.    When you say SEALE executed the search warrant,

did the officers or did anyone actually read the search

warrant?

A.    I did not.  The only other person that was there

from my department in the capacity of like a detective

was Captain Hanson.

Q.    And Captain Hanson was the individual or officer

wearing the GoPro kind of like a body cam?

A.    Correct.

Q.    So as far as you're concerned you did not observe

or read the search warrant to see if it was accurate?

A.    I did not.

Q.    You agree with me that before you execute a search

warrant you have a duty legally to review the search

warrant, make sure it's --

A.    I was just asked to come provide support.

Q.    Right.  I understand.  I'm not asking in this

particular case, but you also agree with me that police

officers are -- just because a judge signs a warrant

doesn't mean it's a good warrant, you have to review it

yourself.

A.   Correct.

Q.   That's a legal obligation.  Did you go through OPOTA?

A.   Yes.

Q.   So an officer can't say there was a search warrant and the Judge signed it, right?  That's not a defense.

A.   Correct.

Q.   Okay.  And the search warrant in this case was prepared by Detective Johnson?

A.   Correct.

Q.   And you were in front of 19321 Milan Drive because it was your impression at the time that Michael Menefield might be residing at that location?

A.   Yes.  I don't remember the exact address.  I just know a couple houses to the west.

Q.   So to rephrase that, it's fair to say that there's a couple houses to the west that it was possible that Michael Menefield was in?

A.   Yeah.  Or any family member.

Q.   And this was conveyed to you by the Cleveland Gang Unit?

A.   No.  I just knew this from my experience in patrol.  I'd been there before and talked to them.

Q.   Sure.  Other officers were aware of this at the time, that's why you were at that location.

A.   The house in question or those two houses?

Q.   The house in question that you were --

A.   I was the only one in front of those.

Q.   And that was because --

A.   Just because the family used to live there.

Q.   And this was known to the team that was briefing?

A.   That I have no idea.

Q.   We'd have to ask them?

A.   Yes.

Q.   Where was Detective Johnson when this was happening?

A.   To be honest with you, I have no idea.

            MR. PATITUCE:     Thank you.  No further questions.

            THE COURT:     Redirect.

            REDIRECT EXAMINATION OF TOM HALLEY

BY MR. KIRKLAND:

Q.   Your experience I believe you indicated is when he was a juvenile; is that correct?

A.   I think so.

            MR. KIRKLAND:     No further questions.

            THE COURT:     Detective, at the time you were executing the warrant, did you have any present knowledge or memory as to where Michael Menefield was living on Milan Avenue?

1          THE WITNESS:      Other than in the quick

2     briefing in the basement given by one of the SWAT

3     members on who the person that they were looking

4     for.

5          THE COURT:      And that briefing

6     indicated that the house that they were going to

7     search, that number 19409.

8          THE WITNESS:   Correct.

9          THE COURT:      When that was mentioned,

10    at the briefing, did you have any direct knowledge

11    that Michael Menefield was associated with that

12    address?

13         THE WITNESS:   Other than there was a

14    possibility that he may be at that house.

15         THE COURT:      Was that based on your own

16    knowledge and experience of knowing him somewhat

17    as you described or did that come from what the

18    SEALE team mentioned to you?

19         THE WITNESS:   From what the team had

20    mentioned.

21         THE COURT:      So you didn't have any

22    independent knowledge that he may be at that

23    location?

24         THE WITNESS:      No.

25         THE COURT:    Any follow-up on by either

1     party?

2              MR. KIRKLAND:      Nothing.

3              MR. PATITUCE:      Yes, your Honor.

4         RECROSS-EXAMINATION OF TOM HALLEY

5    BY MR. PATITUCE:

6    Q.    You are a Maple Heights detective.

7    A.    Correct.

8    Q.    So that's your city and you investigate crimes

9    that happen there?

10   A.    Yes.

11   Q.    And at the time you had no knowledge that Michael

12   Menefield was living in the house outside of what was

13   said at the briefing?

14   A.    No.

15   Q.    And I think you said in response to the Judge's

16   questions that during the briefing Michael Menefield

17   was the person you were looking for?

18   A.    No, that Cleveland was looking for.  We weren't

19   looking for.

20   Q.    I apologize.  The person Cleveland was looking for

21   was Michael Menefield.  That's the whole point of this

22   was looking for Michael Menefield?

23   A.    Yeah, that's one of the things they had mentioned

24   in the briefing to us.

25              MR. PATITUCE:      Thank you.  No further

1    questions.

2            THE COURT:      Follow-up?

3            MR. KIRKLAND:      Nothing.

4            THE COURT:      Thank you, detective.  And

5    that concludes your testimony.  Watch your step.

6    There are two steps down.

7            Any further information that needs to be

8    presented by either side?

9            MR. KIRKLAND:      Nothing on behalf of

10   the State, your Honor.  Only issue would be the --

11           MR. PATITUCE:      The only remaining

12   issue would be whether or not the Court feels

13   Judge Astrab's testimony is necessary for the

14   second prong.

15           THE COURT:      First, I'd like to get

16   the exhibits that were mentioned in this

17   hearing.  So I can have that.

18           And one is the --

19           MR. KIRKLAND:      Search warrant.

20           THE COURT:      And we have Defendant's

21   Exhibits A and B.  Any objections by either side

22   to any of these documents?

23           MR. KIRKLAND:      Nothing --

24           MR. PATITUCE:      No.

25           MR. KIRKLAND:      -- on behalf of the

```
 1    State.
 2              THE COURT:    They will be accepted into
 3    evidence.
 4              Now, Mr. Patituce, you mentioned with
 5    regard to Judge Astrab something on Facebook that
 6    you had copied or some sort of public document.
 7              MR. PATITUCE:    Well, I did not --
 8              THE COURT:    You referenced that I
 9    believe and you read a portion of that.
10              MR. PATITUCE:    Yes, your Honor.  I
11    could mark that and submit it to the Court if the
12    Court likes.
13              THE COURT:    I would like that,
14    please.
15              MR. KIRKLAND:    I don't know if it's
16    been adequately authenticated, your Honor.
17              THE COURT:    Well, I understand that
18    I'm not accepting it into evidence, but I do want
19    to at least understand what that document is.
20              And, Ms. Griffin -- I'm sorry,
21    Ms. Graham, you certainly should be looking at it
22    as well.
23              MS. GRAHAM:    Do you have another
24    copy?
25              MR. PATITUCE:    No, that's my only
```

1 copy I have.  Electronically I have it stored

2 but -- I should -- actually I lied.  Here.

3    THE COURT: And while Ms. Graham is

4 looking at it and Mr. Kirkland is looking at it,

5 Mr. Patituce, why don't you describe for the

6 record what these two documents are so at least

7 we'll all know what they are.

8    MR. PATITUCE: Just to be clear for

9 the record, your Honor, one is a color copy, the

10 other is a black and white, they're just printed

11 off.

12    THE COURT: Same document?

13    MR. PATITUCE: Same document printed

14 off in different orientations I guess.

15    THE COURT: What is that?

16    MR. PATITUCE: It is a Facebook

17 postng by Judge Astrab on September 2015.  He's

18 sharing a picture in thanks to the people.

19    THE COURT: What's the date of that?

20    MR. PATITUCE: September 22, 2015.

21    And just for purposes of the record I

22 know the Court is not taking it as evidence, but I

23 did mark it as Defendant's Exhibit C so it can

24 be --

25    THE COURT: And this is Judge

1    Astrab's --

2         MR. PATITUCE:    Mike Astrab.

3         THE COURT:    -- Judge Astrab's

4    Facebook.

5         MR. PATITUCE:    Yes, your Honor.   This

6    is a posting authenticated by him.

7         MR. KIRKLAND:    Supposedly.   Again I'm

8    objecting on the authentication basis.

9         MR. PATITUCE:    It says, It's been a

10   tough few months with stress from cases, death

11   threats and the usual political rigamarole that

12   always rolls around.

13         I wanted to take a moment to thank

14   everyone who has put up with me and stuck by my

15   side.   It means a lot that folks believe in me and

16   what I'm trying to get accomplished.   I'd tag

17   people but it would be just too long.   Just know

18   I'm appreciative.

19         And then there's that stock paragraph

20   expressing --

21         MS. GRAHAM:    I would say reading that

22   alone I don't see how on Earth you can possibly

23   show any type of a bias by Judge Astrab that it

24   could be a basis of requiring him to testify in

25   this case.

1    THE COURT:    Do you have any other

2    documents from Judge Astrab like this or others?

3    MR. PATITUCE:    I do have others but

4    none that, I mean, talks about the significant

5    sentences that he gave out and how he's adopted

6    certain policies, but I believe that his reference

7    in here about the two death threats months later

8    manifest that it's been with him and it was with

9    him through the time that he was in his capacity

10   actually referencing --

11   THE COURT:    The search warrant was

12   presented to him somewhere in what?  End of April?

13   MR. KIRKLAND:    August 12th, your

14   Honor.  April 12th, your Honor.

15   THE COURT:    April 12th, 2016?

16   MR. KIRKLAND:    Yes, your Honor.

17   MS. GRAHAM:    So a post thanking his,

18   I guess, Facebook friends or whoever this is

19   supposed to be through supporting him for stress

20   is supposed to be evidence of bias against gang

21   members in a particular case?  I don't see how it

22   could be possibly.

23   MR. PATITUCE:    We'll go through

24   stress to death threats months after the alleged

25   threat he's referencing the death threats that's

1    not saying I've had stress --

2         MS. GRAHAM:     But it didn't say

3    anything particular about gangs or his bias

4    against gangs or anything showing he is carrying a

5    bias.  Having stress about things does not mean

6    you're biased against someone.

7         MR. PATITUCE:     Are you arguing to me

8    or to the Judge?

9         THE COURT:     That's approximately

10   seven months prior to presentation of the search

11   warrant.

12        Do you have any other documents by Judge

13   Astrab?

14        MR. PATITUCE:     Not at the present,

15   your Honor.

16        THE COURT:     Now, unless I missed it

17   then at this hour given we've had kind of a long

18   day, all of us have, I may have missed it but to

19   confirm did you inquire of Detective Johnson

20   anything about Judge Astrab executing or reviewing

21   the search warrant?

22        MR. PATITUCE:     I did, your Honor.

23        MR. KIRKLAND:     I believe, yes, he did

24   discuss that, your Honor.

25        THE COURT:     And remind me what the

1    detective said about that.

2         MR. PATITUCE:    Certainly, your Honor,

3    if you want.

4         MR. KIRKLAND:    My recollection is

5    that he just said Judge Astrab went through it

6    paragraph by paragraph and then at the conclusion

7    of it just signed the affidavit.  There was no

8    indication --

9         THE COURT:    I remember that testimony

10    but was that in response to a specific question --

11         MR. KIRKLAND:    I believe it was.

12         THE COURT:    -- by you?

13         MR. PATITUCE:    There was a question,

14    your Honor.  I also was inquiring of the detective

15    as to his knowledge of what happened to Judge

16    Astrab in the William Hammonds case.

17         And, your Honor, I want to point out too

18    that I know while the prosecutor says this is kind

19    of ridiculous or a stretch, the Cuyahoga County

20    bench, all the other 33 judges, you all recused

21    yourself because Judge Astrab was the victim.

22         Every single judge in this county recused

23    themselves from hearing the Hammonds case and the

24    Supreme Court ended up assigning Judge Dale

25    Crawford to hear it because while none of you may

1     actually be biased or hold it against a criminal

2     defendant, and I would never -- actually I would

3     never argue I have any reason to think, for

4     instance you, your Honor, would do that, but the

5     mere appearance of impropriety caused 33 judges to

6     step away from the Hammonds case and to say to be

7     detached and neutral a judge that isn't of our

8     bench needs to hear, then I believe a judge who is

9     a defendant and a citizen, or in a case of a

10    permanent resident who is a defendant should have

11    same privy.

12          And I don't mean to be disrespectful of a

13    bench if a judge can sit and judge another person

14    should sit in the same eyes of the law and if 33

15    judges in Cuyahoga County are going to recuse

16    themselves from a case in which a colleague is a

17    victim, then Judge Astrab should have recused

18    himself from a case in which he had already been

19    victimized by the same group

20          MS. GRAHAM:    In response to that, your

21    Honor, if that were the case, the Cuyahoga County

22    Common Pleas Court could never hear a case

23    involving the Heartless Felons ever under his

24    theory.  That isn't the case that you can no

25    longer be impartial just because of a prior

1    case.  So --

2           THE COURT:     I didn't hear him say

3    quite that.

4           MS. GRAHAM:     Following that logic

5    though that's what he's basically insinuating

6    because this case may involve Heartless Felons and

7    there cannot be inferences in this case and

8    there's nothing to support that.

9           THE COURT:     I take her point and

10   maybe I'll just try to rephrase it.

11          Are you suggesting that because I along

12   with the other 33 judges recused ourselves when

13   Judge Astrab was considered a victim, and

14   subsequently a judge outside of our jurisdiction

15   or our county was appointed to hear that case by

16   the Supreme Court, because I did that, along with

17   the rest of the bench, I should not be hearing

18   this case because it has reference to Heartless

19   Felons in it?

20          MR. PATITUCE:     No, that is not the

21   point that I'm making, your Honor.

22          The point that I'm making is that when

23   Judge Astrab was singularly the victim of the

24   case, the bench recused themselves because Judge

25   Astrab was the victim.

1    Judge Astrab is the judge who the warrant

2    was taken to in this case.  The warrant was taken

3    to Judge Astrab who was the victim and who will

4    remain the victim for the rest of his life.

5    What was done to him was inappropriate,

6    it was criminal, it was outrageous to threaten the

7    child of any parent.  That's absolutely outrageous

8    conduct.  So Judge Astrab should recuse himself

9    from cases involving the Heartless Felons.  That

10   doesn't go to the rest of the bench because the

11   connection -- the slight difference is Judge

12   Astrab was the victim.  He's the Judge so the

13   bench recused themselves.

14   Judge Astrab was the victim of the

15   Heartless Felons so that that's singular to him.

16   The rest of the bench wasn't the victim.  So Judge

17   Astrab should be recusing himself from Heartless

18   Felons cases is my point.

19        THE COURT:     I understand.

20        MS. GRAHAM:     He was the victim of

21   specific people who may have been members of the

22   Heartless Felons.  To generalize that towards an

23   overarching bias against all people who may be

24   associated with the Heartless Felons in the future

25   just can't be imputed upon him.

There's a presumption of being unbiased
and impartial by judges and I'll go back to, and I
don't think we got into this yet, but the
testimony that was given by the detective was that
defense counsel asked him what Judge Astrab had to
say if he asked him about his feelings about it
and he said, no, he didn't say anything to him
about his feelings in particular so there's
nothing, no conduct, no statement to show a bias
on the part of Judge Astrab.

This is all being imputed upon him based
on the general assumption that there must be a
bias without any factual support for it.

THE COURT:     Now, Mr. Patituce, is
your position that this constitutes the appearance
of impropriety or actual impropriety?

MR. PATITUCE:     Oh, your Honor, I
would not -- in the Supreme Court framework I
would not be using -- I don't want to imply that
Judge Astrab was acting unethically or
unprofessionally.

With the term impropriety what I'm trying
to say, I don't believe Judge Astrab broke the
rules of ethics.  I am in no way suggesting that
because I know this is being taken down.

1    But what I am suggesting under the
2    framework of Franks is that there is objectively,
3    just objectively there is on the very face of it
4    from the allegation and the facts objectively
5    speaking that he is not detached and he is not
6    neutral.
7        THE COURT:    Does either side need any
8    further briefing on this based on the testimony
9    that's come out here today and comments made by
10   counsel advocating this motion?
11       MS. GRAHAM:    If your Honor would
12   like --
13       THE COURT:    Ms. Graham, do you feel
14   that you want to supplement anything that you've
15   already filed based on the discussion and
16   information?
17       MS. GRAHAM:    Well, some of this that
18   was brought up was not in his opposition so
19   perhaps maybe that would be officially --
20       THE COURT:    If you want to supplement
21   anything that you've already filed, Mr. Patituce?
22       MR. PATITUCE:    At this time, no.
23       THE COURT:    All right.  So file your
24   supplemental documents.  Ten days, is that
25   adequate for you?

```
1           MS. GRAHAM:      Yes, your Honor.
2           THE COURT:    So I'll take it under
3    advisement until then and make my decision upon
4    receiving your documents and reviewing the entire
5    matter.
6           Thank you very much.
7           MR. KIRKLAND:     Thank you, your Honor.
8           MR. PATITUCE:     Thank you, your Honor.
9                          - - - - -
10          (Thereupon, Court was adjourned.)
11                          - - - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```