# Preliminary Expert Report of Seth W. Stoughton

I was retained by counsel for the plaintiff in this case to review events related to the interactions between officers employed by multiple police agencies and Andrew Carr. This preliminary report is based on the materials reviewed to date. Should any subsequent information cause me to expand, add, or revise any of my opinions, I reserve the right to supplement this report accordingly.

## Table of Contents

Background and Qualifications .................................................................................................. 2
Compensation ............................................................................................................................. 3
Methodology .............................................................................................................................. 4
Understanding of Facts .............................................................................................................. 7
   1. Investigation ....................................................................................................................... 7
   2. Warrant Execution ............................................................................................................. 9
Opinions ................................................................................................................................... 15
   1. Any Failure to Review the Warrant was Unreasonable .................................................. 15
   2. No Reasonable Officer Would Have Relied on the Search Warrant .............................. 16
   3. The Officers Appear to Not Have Knocked and Announced Prior to Breaching the Door. 19
Submission ............................................................................................................................... 20


EXHIBIT C

## Background and Qualifications

My opinions are based in part on my training, professional experience, education, and research. My background and qualifications are set forth in the curriculum vitae attached to this report. I highlight and supplement that material here with information that is particularly relevant to my review and evaluation in this case.

I served as an officer in the Tallahassee Police Department in Tallahassee, Florida. The city of Tallahassee is located in northern Florida; it encompasses over 90 square miles and has a city population of over 180,000 and a metropolitan-area population of over 375,000. The Tallahassee Police Department employs over 350 sworn officers.

I was employed as an officer for a total of five and a half years. I served as a full-time officer from March 2001 until October 2005, and a reserve (part-time) officer from November 2005 until June 2006. In that time, I earned and maintained several operator and instructor certifications beyond my certification as a police officer. During the course of my service with the department, I was assigned to the Uniform Patrol Division. I also had a wide range of duties beyond my standard duty assignment. Those duties included serving as a Special Response Team member from 2003 until 2005, establishing and teaching community self-defense courses, and serving as an acting supervisor as needed. As an officer, I conducted hundreds of investigations, made hundreds of arrests, swore out or served dozens of search and arrest warrants, and forced entry into private residences and other locations on many occasions.

I also served as an investigator in the Florida Department of Education's Office of Inspector General. The Florida Department of Education has state-wide authority related to education, including providing technical assistance and support to 67 local school districts, the Florida School for the Deaf and the Blind, and 28 state and community colleges; the management of statewide education funding and teacher certifications; the administration of private school tuition voucher programs; and the operation of Florida's Division of Blind Services and Division of Vocational Rehabilitation. The Florida Department of Education has more than 2,500 employees and has an annual budget of more than $20 billion, roughly a quarter of Florida's total budgetary expenditures. The Office of Inspector General is responsible for, *inter alia*, conducting and coordinating investigations into allegations of waste, fraud, abuse, and financial mismanagement within or related to the Florida Department of Education.

I was employed as an investigator for more than two and half years, serving from November 2005 until July 2008. In that time, I earned and maintained several professional certifications. As an investigator, I conducted investigations into alleged criminal and administrative violations. I conducted a variety of criminal investigations, led and coordinated multi-agency criminal investigations into allegations of private school tuition voucher fraud, swore out warrants, conducted administrative investigations into employee misfeasance and malfeasance, trained new investigators, drafted investigative policy, and reviewed investigative reports.

In addition to specialized knowledge from my experience as an officer and investigator, my expertise in policing also arises from the academic research on policing I have conducted for more than six years. I am on the faculty of the University of South Carolina School of Law,

where I teach in the area of criminal law and criminal procedure. My research is focused on the regulation of policing, including police procedure and tactics. My previous academic appointment was a two-year teaching fellowship at Harvard Law School, where I specialized in police research. My scholarship has been published in or is forthcoming from the *Harvard Law Review Forum*, the *Minnesota Law Review*, the *North Carolina Law Review*, the *Wake Forest Law Review*, the *Virginia Law Review*, and other prestigious academic journals, and it is broadly cited by legal scholars, criminologists, policing practitioners, and others. I have also filed or joined multiple briefs *amicus curiae* to the Supreme Court of the United States related to police procedure, tactics, and the use of force. Additionally, I have written about policing for *The New York Times*, *The Atlantic*, *TIME*, and other media publications, and have made hundreds of appearances on national and international print, radio, and television media as a policing expert.

I am regularly invited to speak about various aspects of policing to legal, law enforcement, and academic audiences. To date, I have formally presented more than 75 times to audiences that include the Conference of Chief Justices; the Command Staff of the Kansas City (Missouri) Police Department; Chicago's Civilian Office of Police Accountability, federal Inspector Generals & Investigators; the Senior Executive Staff of the Bureau of Alcohol, Tobacco, Firearms, and Explosives; the Federal Law Enforcement Training Center; the Peace Officers' Association of Georgia; the Washington State Criminal Justice Standards Commission's Law Enforcement Academy, multiple state judicial conferences, and various other audiences.

I also provide subject matter expertise in the context of police consulting and litigation. I serve as a subject matter expert for the United States Department of Justice Body-Worn Camera Toolkit, I assisted the OIR Group in its Police and Procedure Review of the Madison Police Department, and I am under contract to provide consulting services to the State Attorney's Office for the Fourth Judicial Circuit in Jacksonville, Florida. Additionally, I am regularly retained to provide expert review and testimony in the context of police litigation. I have been qualified as an expert witness in state and federal courts and in the course of both civil and criminal litigation. A complete list of cases in which I have provided testimony or written reports is provided in the attached curriculum vitae.

I currently serve on the Citizen Advisory Council of the Columbia Police Department in Columbia, South Carolina, a department of approximately 350 sworn officers serving a city with a population of over 130,000 and a metropolitan-area population of over 800,000.

**Compensation**

My fee for analysis in this case is $320 per hour.

**Methodology**

To ensure my methodology was reliable, I did not assign credibility to any witness or source of information prior to a comprehensive review of provided materials, I developed my understanding of relevant facts only after a review of all materials provided, and I assumed those facts to be true solely for the purpose of analysis. In sum, I reviewed sufficient data to reach conclusions to a reasonable degree of professional certainty. I then analyzed those facts against a backdrop of the professional standards for police officers and the protocols for investigations, seizures, arrests, and other practices, principles and protocols recognized, relied upon, and employed in the law enforcement profession on the date of this incident, particularly with regard to investigations, the detention and arrest of civilians, and the police role in involuntary psychiatric evaluations. The methodology is consistent with the methodology utilized by other experts in the field of law enforcement when conducting an analysis of incidents of this type.

My testimony regarding police procedure, investigations, and warrant service are all relevant areas of testimony that would assist a jury in understanding the evidence presented to them.

Before developing my opinions in this case, I reviewed the following materials:[1]
- Affidavit for Search Warrant, April 12, 2016
- Affidavit Establishing Probable Cause for Warrantless Arrest (Andrew Carr), 2016 APR 15 PM 4:08
- Affidavit Establishing Probable Cause for Warrantless Arrest (Michael Menefield), 2016 APR 15 PM 4:09
- Cleveland Division of Police Detail Report
- Cleveland Police Department Search Warrant Inventory List
- Complaint, Carr v. Johnson et al., 1:17-cv-00620
- Curriculum Vitae of Martin W. Lewis
- Depositions
  - Michael Astrab, Feb. 9, 2018
- Electronic Media
  - 12063022_010295831494118_423315872_n.jpg
    - Picture of five black males posing for the camera
  - 12955654_1053542858018428_256222743_n.mp4
    - Video of black male driving while holding cash & firearms
  - 12958016_1060417184033221_1676448462_n.mp4
    - Video of black individual shooting a pistol at an indoor shooting range
  - ALFRED JOHNSON HR_KK_REDACTED.PDF
  - ALFRED JOHNSON POLICE_KK_Redacted.DPF
  - Capture.PNG
    - Screenshot of social media post on Sept 21 2015 at 15:33:41

---

[1] Documents are identified by title where possible and by description when deemed necessary.

- Capture 3.PNG
                - Screenshot of social media post (video of black individual shooting a pistol at an indoor shooting range) on Apr 9 2016 at 13:37:52
            - Capture 22.PNG
                - Screenshot of social media post (paused video of black male driving while holding cash & firearms) on Apr 9 2016 at 13:02:09
            - CARR, JAMES – 107-110 (dismissal) (LLOYD).PDF
            - CARR,_ANDREW_001-106_(Motion)_(Schuler) (FullSize).PDF
                - Transcript of Proceedings, October 11, 2016
            - GOPR0020.MP4
                - Video of entry
            - MILAN.mp4
                - Video of a post-search walkthrough at 19409 Milan Drive
- Garfield Heights Police Department Crime Scene Diagram Form
- Laboratory Report (GSR) & Notarized Statement of Martin W. Lewis
- Maple Heights Police Department Consent to Withdraw Blood, Hair, And/Or Buccal for DNA Testing
- Maple Heights Police Department
    - Evidence Custody Form
    - Evidence Report
    - Incident/Offense Report, 16-0027496
        - Initial & Related Investigative Reports
    - Report, 4/18/2016 15:17
    - Search Inventory Form
    - Statement of Steven Davis
    - Statement of Ron Dodge
    - Statement of Keith Kulak
    - Suspect Rights Statement
        - Andrew Carr
        - Derrick Carr
        - Stephen Carr
- Municipal Court, Bond Entry
    - Andrew Carr
    - Michael Menefield
- Ohio v. Carr, Prosecuting Attorney's Response to Defendant's Request for Discovery, Case 605515-16-CR
    - Attached Bill of Particulars
- Ohio v. Carr, Supplemental Response to Request for Discovery, Case 605515-16-CR, multiple
- Photographs, Screenshots, Plat, & Sketches

- Police Summary of Statements of Defendant Andrew J. Carr, 4/15/2016 14:47
- Records re: Andrew Carr
    - CCW record
    - Driver's license & driving records
    - NCIC check
    - Social Security Search
    - Ohio Criminal History
- Records re: Michael Menefield
    - Thomson Reuters Individual Report Plus Associates
    - Driver's license & driving records
    - NCIC check
    - Social Security Search
    - Ohio Criminal History
- Response to Interrogatories
    - Defendant Ron Dodge's Answers to Plaintiff's Second Demand for Interrogatories and Demand for Documents up Defendant Ron Dodge
    - Keith E. Kulak Responses to Plaintiff's Second Demand for Interrogatories and Demand for Documents upon Keith E. Kulak
    - Stephen Davis Responses to Plaintiff's Second Demand for Interrogatories and Demand for Documents upon Stephen Davis
- Review of Alfred Johnson's Personnel File
- S.E.A.L.E. SWAT After Action Report
- South East Area Law Enforcement SWAT Team Reports
    - Member Statement of Ron Dodge
    - Member Statement of Steven Davis
    - Member Statement of Ben Lang
    - Member Statement of Robert Soltis
    - Member Statement of Keith Kulak
    - Member Statement of Nick Rossi
    - Member Statement of Richard Cramer
    - Member Statement of Matt Berger
    - Member Statement of James Seawright
- Search Warrant, April 27, 2016
- True Bill Indictment of Andrew J. Carr
- United States Census Bureau
    - Selected Economic Characteristics, 2012-2016 American Community Survey 5-Year Estimates
    - Demographic and Housing Estimates, 2012-2016 American Community Survey 5-Year Estimates
- Additional materials, including Bates stamped materials, not specifically identified.

**Understanding of Facts**

The following summary relates to an investigation of Michael Menefield and the April 15, 2016, and the execution of a search warrant at 19409 Milan Drive, Maple Heights, Cuyahoga County, Ohio.[2]

### 1. Investigation

In early 2014, officers assigned to the Cleveland Police Department's Gang Impact Unit were investigating a street gang known as the "Heartless Felons."[3] On August 1, 2014, officers arrested a known member of the Heartless Felons gang. Michael Menefield was with the known gang member at the time and was himself arrested for improperly handling firearms in a motor vehicle.[4] Mr. Menefield pleaded guilty on January 6, 2015, served a prison sentence, and was released on September 21, 2015.[5]

After Mr. Menefield's release, officers began investigating him for weapons-related offenses. On April 12, 2016, an officer ultimately applied for and received a search warrant for 19409 Milan Drive, Maple Heights, Cuyahoga County, Ohio.[6]

The affidavit in support of the search warrant has a single sentence linking Mr. Menefield to that address. That sentence states: "Affiant avers that Michael Menefield, DOB [omitted], SSN [omitted], listed his address as 19409 Milan Drive, Maple Heights, Cuyahoga County, Ohio 44137."[7] The relevant portion of the affidavit states as follows:

11. Affiant avers that Michael Menefield served his prison term and was released from prison on September 21, 2015.

12. Affiant avers that Michael Menefield, DOB [omitted], SSN [omitted], listed his address as 19409 Milan Drive, Maple Heights, Cuyahoga County, Ohio 44137.

13. Affiant avers that continued monitoring of social media revealed Michael Menefield having an Instagram account . . .[8]

---

[2] The address is located in ZIP code 44137. According to ZIP code-level data from the United States Census Bureau, in 2016 the area was estimated to be predominantly (74%) Black or African American. Approximately 62.5% percent of the population was in the labor force, and the unemployment rate was 12.6%. In comparison, the national average unemployment rate at the time was 7.4%. The median household income for that ZIP code was $37,958, compared to a national median of $55,322, and the mean household income for the area was $46,870, compared to a national mean of $77,866. In that ZIP code, 17.8% of families and 21% of all individuals had past-year income below the poverty level, compared to 11% of families and 15.1% of individuals nationally. Approximately 23.6% of households in that ZIP code received Food Stamps/SNAP benefits in the last year, compared to a national average of 13%, and 4.5% of households received cash public assistance income, compared to a national average of 2.7%. United States Census Bureau, 2012-2016 American Community Survey 5-Year Estimates.
[3] Affidavit for Search Warrant, April 12, 2016, 5-6.
[4] Affidavit for Search Warrant, April 12, 2016, 7.
[5] Affidavit for Search Warrant, April 12, 2016, 7.
[6] Astrab Dep., 12:4-20, Feb. 9, 2016.
[7] Affidavit for Search Warrant, April 12, 2016, 7.
[8] Affidavit for Search Warrant, April 12, 2016, 7.

The affidavit does not explain when and in what context Mr. Menefield "listed his address."[9]

The affidavit makes several statements about the typical actions of "persons who are criminal gang members" and "individuals involved in illegal gang activities,"[10] however, it nowhere asserts that Mr. Menefield himself was a criminal gang member. Instead, the affidavit asserts that officers had probable cause to believe that Mr. Menefield had committed firearms-related offenses based on 1) information provided by a Confidential Informant, and 2) information gleaned from social media.

**Confidential Informant.** According to the affidavit, a Confidential Informant stated that Mr. Menefield was the source of a firearm that had been previously recovered at a gang-affiliated address (15609 Steinway Avenue, Cleveland, OH) and that Mr. Menefield "supplies weapons for members of" the Heartless Felons gang in Maple Heights.[11] There is nothing in the affidavit suggesting that the Confidential Informant provided information about Mr. Menefield's address or the location of any additional weapons.

**Social Media.** The affidavit also identified three relevant posts to Mr. Menefield's Instagram account (Instagram is a social media platform that allows users to post pictures and video):

- A video described as showing Mr. Menefield firing a rifle, posted October 22, 2015.[12] A copy of the video was not available for this review, so I cannot analyze its content.

- A video described as showing Mr. Menefield driving and holding folded cash with multiple handguns on his lap.[13] My review of the video is consistent with this description; a black male, presumably Mr. Menefield, is shown as described.

- A video described as showing Mr. Menefield firing a handgun at a gun range.[14] My review of the video is not consistent with this description. The video shows *someone* firing a handgun at a gun range, but only the shooter's right arm and hand and the right side of a pair of protective ear muffs are visible; the shooter's head and face are not. The video does not provide sufficient information to identify the shooter. Further, it is impossible to determine from the video whether the gun being fired is one of the guns that Mr. Menefield had on his lap in the prior video.

There is nothing in affidavit suggesting that the social media posts provided information about Mr. Menefield's address or the geographic location of the firearms (especially their location at times other than when they were shown in a vehicle and a shooting range).

---

[9] Affidavit for Search Warrant, April 12, 2016, 7.
[10] Affidavit for Search Warrant, April 12, 2016, 8-9.
[11] Affidavit for Search Warrant, April 12, 2016, 7
[12] Affidavit for Search Warrant, April 12, 2016, 7.
[13] Affidavit for Search Warrant, April 12, 2016, 7.
[14] Affidavit for Search Warrant, April 12, 2016, 7.

## 2. Warrant Execution

Shortly after 7:00am on Friday, April 15, 2016, officers went to 19409 Milan Drive.[15] Based on officers' later statements, they intended to serve the extant search warrant for that address "while also looking to speak with a male by the name of Michael Menefield."[16]

It is unclear whether any of the officers actually reviewed the search warrant; Officer Ron Dodge, Sergeant Keith Kulak, and Patrolman Stephen Davis all submitted written response to an interrogatory indicated they "did not have the opportunity to personally review the Search Warrant prior to its execution."[17] In his response, Officer Dodge indicated, "[t]hat function is handled by SEALE Team Commander Robert Soltis."[18] Both Sgt. Kulak and Ptl. Davis also stated, "That function is handled by the SEALE Team Commander who would have served as the liaison between SEALE Team and City of Cleveland Detective Alfred Johnson."[19]

Notably, however, none of the officers affirmatively stated that Soltis actually *did* review the search warrant. Officer Soltis's written description of his actions leading up to and during the execution of the search warrant is similarly lacking any affirmative statement to the effect that he actually reviewed the warrant.[20]

There are inconsistencies in the description of events immediately prior to officers forcing entry.

Most of the officers later indicated that they knocked and announced prior to forcing entry. According to several officers, Officer Cramer knocked and announced the presence of police.[21] One statement states that Officer Cramer "issued several announcements accompanied by loud knock to the front door."[22] Other officers reported that a knock-and-announce was made, but they do not identify which officer knocked and announced.[23] One officer's statement is silent as to

---

[15] Affidavit Establishing Probable Cause for Warrantless Arrest, 2016 APR 15 PM 4:08, p. 1

[16] Affidavit Establishing Probable Cause for Warrantless Arrest, 2016 APR 15 PM 4:08 (Andrew Carr), p. 1; see also Affidavit Establishing Probable Cause for Warrantless Arrest, 2016 APR 15 PM 4:09 (Michael Menefield), p. 1; Maple Heights Police Department Report, 4/18/2016 15:17, p. 12.

[17] Defendant Ron Dodge's Answers to Plaintiff's Second Demand for Interrogatories and Demand for Documents up Defendant Ron Dodge, p.1; Keith E. Kulak Responses to Plaintiff's Second Demand for Interrogatories and Demand for Documents upon Keith E. Kulak, p.1; Stephen Davis Responses to Plaintiff's Second Demand for Interrogatories and Demand for Documents upon Stephen Davis, p.1.

[18] Defendant Ron Dodge's Answers to Plaintiff's Second Demand for Interrogatories and Demand for Documents up Defendant Ron Dodge, p. 3.

[19] Stephen Davis Responses to Plaintiff's Second Demand for Interrogatories and Demand for Documents upon Stephen Davis, p. 1.

[20] South East Area Law Enforcement SWAT Team Member Statement of Robert Soltis, p. 1.

[21] Maple Heights Police Department Report, 4/18/2016 15:17, p. 13; Maple Heights Police Department Statement of Ron Dodge; Maple Heights Police Department Statement of Keith Kulak.

[22] South East Area Law Enforcement SWAT Team Member Statement of Ron Dodge, p. 1; see also South East Area Law Enforcement SWAT Team Member Statement of Richard Cramer, p. 1; South East Area Law Enforcement SWAT Team Member Statement of Matt Berger, p. 1; South East Area Law Enforcement SWAT Team Member Statement of James Seawright, p. 1.

[23] South East Area Law Enforcement SWAT Team Member Statement of Ben Lang, p. 1; South East Area Law Enforcement SWAT Team Member Statement of Robert Soltis, p. 1; South East Area Law Enforcement SWAT Team Member Statement of Keith Kulak, p. 1; South East Area Law Enforcement SWAT Team Member Statement of Nick Rossi, p. 1.

whether there was a knock and announce.[24]

Officer Ben Lang reported seeing curtains move as the officers approached the house before "the breachers subsequently knocked and announced." He did not identify in which side or opening he saw movement.[25]

Robert Soltis reported, "On approach[period or comma] heard gang unit yell suspect in window [at] kitchen (#4 side) [the western face of the residence] and heard SWAT members yell suspect in living room (#1 side) [the southern-facing front of the residence]. Knock & announce conducted."[26] Chronologically, this suggests the suspects were observed prior to any knock and announce.

Officer Richard Cramer reported that he saw movement at 1 Side/Opening 1 (a window on the western side of the southern-facing front of the residence) after knocking and announcing.[27]

The after-action report states that there as "no response [from] inside" the home after the knock and announce. Later, it states that perimeter officers heard radio traffic tagging movement at the 3/4 corner (the corner where the north-facing back of the residence meets the east-facing side of the residence) and 1 side (the south-facing front of the residence).[28] It is unclear from the narrative of the after-action report whether this radio traffic occurred prior to or after any knock and announce.

Officer Seawright ultimately breached the door with a ram,[29] although it isn't clear whether there was a delay between any announcement and the breach and, if so, how long it was. According to Officer Dodge, Officer Seawright "paused several seconds [after Officer Cramer knocked and announced] before manually breaching the front door with a ram."[30] Officer Seawright later described the amount of time he waited after the announcements as "a short time,"[31] although the after-action report described it as "a substantial amount of time."[32]

After the door was breached, Officer Davis deployed a Noise-Flash Diversionary Device (sometimes referred to as a "flashbang")[33] and was the first to enter the home.[34]

---

[24] South East Area Law Enforcement SWAT Team Member Statement of Steven Davis, p. 1.
[25] South East Area Law Enforcement SWAT Team Member Statement of Ben Lang, p. 1
[26] South East Area Law Enforcement SWAT Team Member Statement of Robert Soltis, p. 1.
[27] South East Area Law Enforcement SWAT Team Member Statement of Richard Cramer, p. 1.
[28] S.E.A.L.E. SWAT After Action Report, p. 1, 2.
29
Maple Heights Police Department Report, 4/18/2016 15:17, p. 13; Maple Heights Police Department Statement of Keith Kulak; Maple Heights Police Department Statement of Rob Dodge.
[30] South East Area Law Enforcement SWAT Team Member Statement of Ron Dodge, p. 1.
[31] South East Area Law Enforcement SWAT Team Member Statement of James Seawright, p. 1.
[32] S.E.A.L.E. SWAT After Action Report, p. 2.
[33] Maple Heights Police Department Report, 4/18/2016 15:17, p. 13; Maple Heights Police Department Statement of Steven Davis; Maple Heights Police Department Statement of Keith Kulak; South East Area Law Enforcement SWAT Team Member Statement of Ron Dodge, p. 1; South East Area Law Enforcement SWAT Team Member Statement of Steven Davis, p. 1.
[34] Maple Heights Police Department Report, 4/18/2016 15:17, p. 13; Maple Heights Police Department Statement of Ron Dodge; South East Area Law Enforcement SWAT Team Member Statement of Ron Dodge, p. 1.

One of the officers was wearing a GoPro, a mobile video camera, which started recording prior to the officer's arrival on scene. At 0:00:24, the GoPro video shows the officer exiting a vehicle, then walking easterly (as indicated by the rising sun). Other officers can be seen moving toward the target address from across the street. At 0:00:44, one officer can be seen going between the houses immediately west of the target address while the officer wearing the GoPro and two other officers walk through the front yards. A screen capture is provided for illustration (the beige house in the middle of the picture is immediately to the west of the target address):



Shortly after, another group of officers can be seen staging at the front door of the target address. The officer wearing the GoPro is either adjusting it or making contact with the microphone, resulting in garbled audio.

At 0:00:54, one of the officers—presumably one preparing to enter the residence—can be heard yelling, "Window, window, window." The officers approaching from the west are not yet in position at this point; one of them is standing next to a white vehicle in the driveway immediately east (near the 1/2 corner) of the target address. The second officer is further west, roughly even with the edge of some hedges in the front yard of the neighboring house. The officer wearing the GoPro is on or near the next driveway to the west. A screen capture at 0:00:55 is provided for illustration:

-11-



For comparison, I have retrieved a Google 2D overhead image[35] and a Google Street View image[36] and indicated on those images the approximate positions of the officers approaching from the west when the other officer begins yelling. On both of the images on the next page, the brown vehicle model represents the white vehicle parked in the driveway, while the three red tags indicate the approximate location of the officers at the point when the officer begins yelling, "Window, window, window." (Viewers are advised to disregard any other vehicles in the below images; those vehicle were present when the Google images were taken, but not necessarily during the execution of the search warrant on April 15, 2016.)

This space intentionally left blank.

---

[35] Retrieved on June 25, 2018.
[36] Retrieved on June 25, 2018, and featuring an image captured in August 2014.





When officers were at approximately the positioned indicated, an officer began yelling, "Window, window, window. Hands up! Hands up, window!"

At 0:00:56, at about the same time the yelling officer can be heard saying, "Hands up!" for the first time, a single bang can be heard. At 0:00:59, shortly after the yelling officer has finished saying, "Hands up, window!" a louder bang can be heard.[37]

At about the same time as the second bang, someone can be heard yelling what may be "police!" Shortly after, at 0:01:01, someone can be heard yelling a command, although the words are not readily identifiable.

Andrew Carr, a resident at the target address, later said he was upstairs when he heard "loud banging/smashing noises coming from downstairs." He heard his father yell, "Oh." He heard a loud "'pop'" and saw "a lot of smoke." He was "scared that someone was breaking into the residence."[38] Mr. Carr, who holds a Concealed Handgun License, was at the top of the stairs; he "drew his pistol and fired one round into the floor of the stairs." At that point, he had not seen or heard any indication that the individuals entering his home were police officers.[39] He fired either "upon" the detonation of flashbang or "a few seconds after" or "almost immediately after."[40]

At 0:01:06 on the GoPro video, an officer can be heard saying, "Shots fired, shots fired."

This space intentionally left blank.

---

[37] Although the video is not dispositive on this point, the timing suggests that the first bang (at 0:00:56) is the sound of officers' breaching the front door, and the second (at 0:00:59) is the deployment of a Noise-Flash Diversionary Device (sometimes referred to as a "flashbang" or "concussion grenade").
[38] Police Summary of Statement of Defendant Andrew J. Carr, p. 1-2.
[39] Police Summary of Statement of Defendant Andrew J. Carr, p. 1-2.
[40] Maple Heights Police Department Report, 4/18/2016 15:17, p. 12; Affidavit Establishing Probable Cause for Warrantless Arrest, 2016 APR 15 PM 4:08 (Andrew Carr), p. 1; S.E.A.L.E. SWAT After Action Report, p. 2.

## Opinions

I hold the opinions below to a reasonable degree of professional certainty. The basis and reasons for my opinions are premised upon my education, training, and experience in law enforcement; my knowledge and research as a policing scholar; my knowledge of law enforcement standards, analysis, and study; my familiarity with generally accepted police practices and the professional and academic literature in the field; and my understanding of the facts of this case based upon a comprehensive review of the materials listed above.

My opinions in this case are summarized as follows:

1. Any failure to review the warrant was unreasonable;
2. No reasonable officer would have relied on the search warrant; and
3. The officers appear to not have knocked and announced prior to breaching the door.

The explanations for my opinions are laid out below.

### 1. Any Failure to Review the Warrant was Unreasonable

Officers receive training on warrants, including the substantive and procedural requirements imposed by the Fourth Amendment, by criminal statutes, and by other laws and doctrines. Officers are taught that they can ordinarily rely on a warrant properly issued by a neutral and detached magistrate; even if the warrant is later invalidated, the warrant provides officers with what the Supreme Court has described as a "shield of immunity."[41] However, officers also learn that they cannot rely on warrants that are so lacking "in indicia of probable cause as to render official belief in its existence entirely unreasonable" or when a warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid."[42]

As the Supreme Court put it, "It is incumbent on the officer executing a search warrant to ensure the search is lawfully authorized and lawfully conducted."[43] As that framing suggests, officers—especially officers who regularly serve search and arrest warrants—learn that they have an obligation to read and be familiar with the warrants they serve, including the affidavits supporting those warrants. According to the Supreme Court, "The 'shield of immunity' otherwise conferred by the warrant will be lost . . . where the warrant was 'based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'"[44]

The Sixth Circuit, too, has recognized that a warrant provides officers with a "shield of immunity." However, the Sixth Circuit has also stated explicitly that "the good-faith exception does not apply to affidavits so lacking indicia of probable cause that a belief in the existence of probable cause would be objectively unreasonable."[45]

---

[41] *Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012).
[42] *United States v. Leon*, 468 U.S. 897, 899 (1984)
[43] *Groh v. Ramirez*, 540 U.S. 551, 563 (2004).
[44] *Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012) (quoting *United States v. Leon*, 468 U.S. 897, 899 (1984)).
[45] *United States v. Rose*, 714 F.3d 362, 367 (6th Cir. 2013)

—15—

In short, both the Supreme Court and the Sixth Circuit have explicitly indicated that officers must review warrants they execute, including the affidavits that support those warrants. Without conducting such a review, officers are not in a position to make the basic determinations that the Supreme Court and Sixth Circuit have explicitly called upon them to make: namely, whether the warrant is patently devoid of probable cause and whether the warrant is facially deficient. For those reasons, it is objectively unreasonable to rely on a warrant without reviewing the warrant, including underlying affidavit.

In this case, it is unclear whether any of the officers actually reviewed any portion of the search warrant. Officer Dodge indicated in a written response to an interrogatory that he "did not have the opportunity to personally review the Search Warrant prior to its execution." In the same document, he indicated, "[t]hat function is handled by SEALE Team Commander Robert Soltis."[46] Sergeant Keith Kulak made the same statement, indicating in a written response to an interrogatory that he "did not have the opportunity to personally review the Search Warrant prior to its execution."[47] Patrolman Stephen Davis made the same statement, indicating in a written response to an interrogatory that he "did not have the opportunity to personally review the Search Warrant prior to its execution."[48] Both Sgt. Kulak and Ptl. Davis also stated, "That function is handled by the SEALE Team Commander who would have served as the liaison between SEALE Team and City of Cleveland Detective Alfred Johnson."[49]

Notably, however, none of the officers affirmatively stated that Soltis actually *did* review the search warrant. Officer Soltis's written description of his actions leading up to and during the execution of the search warrant is similarly lacking any affirmative statement to the effect that he actually reviewed the warrant.[50]

To the extent that the officers in this case relied upon the search warrant without reviewing it, such reliance was objectively unreasonable.

### 2. No Reasonable Officer Would Have Relied on the Search Warrant

As described above, officers receive training on warrants, including the substantive and procedural requirements imposed by the Fourth Amendment and their obligation to read and be familiar with the warrants they serve, including the underlying affidavits.

In the context of the substantive requirements, officers are taught that warrants cannot be predicated on conclusory statements, hunches, or beliefs. Instead, they learn, warrants must be supported by a recitation of facts or circumstances that establish a minimum quantum of proof—

---

[46] Defendant Ron Dodge's Answers to Plaintiff's Second Demand for Interrogatories and Demand for Documents upon Defendant Ron Dodge, p. 3.
[47] Keith E. Kulak Responses to Plaintiff's Second Demand for Interrogatories and Demand for Documents upon Keith E. Kulak, p. 1.
[48] Keith E. Kulak Responses to Plaintiff's Second Demand for Interrogatories and Demand for Documents upon Keith E. Kulak, p. 1; Stephen Davis Responses to Plaintiff's Second Demand for Interrogatories and Demand for Documents upon Stephen Davis, p. 1.
[49] Stephen Davis Responses to Plaintiff's Second Demand for Interrogatories and Demand for Documents upon Stephen Davis, p. 1.
[50] South East Area Law Enforcement SWAT Team Member Statement of Robert Soltis, p. 1.

probable cause—to make an arrest or conduct a search. Arrest warrants, they learn, require probable cause that 1) an offense has been committed and 2) that the person whose arrest is sought committed it. More relevantly, officers learn that search warrants require probable cause that either (1) a crime was committed at the location to be searched, or (2) evidence of a crime (i.e., instrumentalities or fruits of a crime) exists at the location to be searched.

As the Sixth Circuit has stated, "To justify a search, the circumstances must indicate why evidence of illegal activity will be found 'in a particular place.' There must, in other words, be a 'nexus between the place to be searched and the evidence sought.'"[51]

Officers learn that probable cause requires reasonably reliable information and cannot be predicated on "stale" information,[52] including information about the presence of evidence at the location to be searched. "[T]he critical question is whether the information contained in the affidavit, when presented to the . . . judge, established that there was a fair probability that [evidence] would still be found at" the target address.[53] "[A] warrant is stale if the probable cause, while sufficient at some point in the past, is now insufficient as to evidence at a specific location."[54] This includes evidence linking a particular person to a particular location. The Sixth Circuit has made this point explicitly, identifying among the relevant considerations whether "the criminal [suspect is] . . . nomadic or entrenched[]."[55]

Officers regularly refer to various governmental records, including criminal justice records, in the course of their duties, but they also know that certain pieces of information, specifically including an individual's home address, are not always accurate. Such information can become stale. Officers are well-aware of the entirely common sensical observation that people relocate from time to time. They are also aware that there is an even higher potential for housing transiency in lower socio-economic areas.

Officers know that individuals who live in low socio-economic status communities—especially individuals who either have a criminal history or are actively involved in crime—often relocate frequently within the community; they can be "nomadic," to use the phrase adopted by the Sixth Circuit. Because of the frequency of relocation, officers learn to distinguish between the addresses where an individual "stays" and the location where an individual "lives." Although the terminology varies in usage, the concepts are consistent and officers regularly distinguish between the two. An individual "stays" at the location or locations where they can regularly be found, where they sleep, and where they keep personal property. To identify where an individual "stays," officers will ask a question such as, "If I had to find you in a couple of days, where would I go?" In contrast, an individual "lives" at the location that they consider to be an official address, regardless of whether they regularly spend time there or have personal property there. Officers

---

[51] *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (quoting *United States v. Van Shutters*, 163 F.3d 331, 336–37 (6th Cir. 1998)); see also *United States v. Abboud*, 438 F.3d 554, 572 (6th Cir. 2006) ("To demonstrate probable cause to justify the issuance of a search warrant, an affidavit must contain facts that indicate a fair probability that evidence of a crime will be located on the premises of the proposed search.").
[52] See, e.g., United States v. Frechette, 583 F.3d 374, 377 (6th Cir. 2009) ("'[S]tale information cannot be used in a probable cause determination.")
[53] *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998).
[54] *United States v. Abboud*, 438 F.3d 554, 572 (6th Cir. 2006)
[55] *United States v. Abboud*, 438 F.3d 554, 572 (6th Cir. 2006)

will seek to identify where an individual "lives" by asking something like, "If I was going to mail you a letter, where would I send it?"

In the context of criminal investigations, the distinction between "staying" and "living" is particularly important precisely because of the probability that an individual's officially designated address is not where the individual actually frequents, resides, or keeps personal property. This is especially true with regard to individuals who have recently been released from incarceration. Such individuals are typically required to provide an address of record, but they often do not stay or keep property at the address they provide, which may be the address of a friend, family member, or significant other. If the individual does stay at that address after release, it is often only for a very brief period before relocating. There is additional reason to doubt the accuracy of information provided by individuals who are or may be affiliated with criminal gangs. Such individuals are often be reluctant to provide accurate information to the authorities about their place of residence for fear that it will be used by law enforcement in future investigations into them personally or other gang members. For these reasons, officers are well-aware that they need to verify a subject's place of residence using valid investigative methods. This is particularly true in low socio-economic status communities with high poverty rates, which have an increased rate of housing transiency.

Maple Heights is a low socio-economic status community with a high rate of poverty. Maple Heights is assigned ZIP code 44137, and US Census data reflects that rates of unemployment, poverty, and public assistance are significantly higher there than the national average. According to ZIP code-level data from the United States Census Bureau, in 2016 the area was estimated to be predominantly (74%) Black or African American. Approximately 62.5% percent of the population was in the labor force, and the unemployment rate was 12.6%. In comparison, the national average at the time was 7.4%. The median household income for that ZIP code was $37,958, compared to a national median of $55,322, and the mean household income for the area was $46,870, compared to a national mean of $77,866. In that ZIP code, 17.8% of families and 21% of all individuals had past-year income below the poverty level, compared to 11% of families and 15.1% of individuals nationally. Approximately 23.6% of households in that ZIP code received Food Stamps/SNAP benefits in the last year, compared to a national average of 13%, and 4.5% of households received cash public assistance income, compared to a national average of 2.7%.[56]

In this case, the affidavit in support of the search warrant has only a single sentence linking Mr. Menefield to 19409 Milan Drive. That sentence states, in full: "Affiant avers that Michael Menefield, DOB [omitted], SSN [omitted], listed his address as 19409 Milan Drive, Maple Heights, Cuyahoga County, Ohio 44137."[57] The affidavit does not explain when and in what context Mr. Menefield "listed his address," although that statement follows immediately after a sentence describing Mr. Menefield's release from prison on September 21, 2015.[58]

To any reasonable officer who read the warrant, therefore, the only connection between Mr. Menefield and 19409 Milan Drive was information self-reported by a convicted felon and,

---

[56] United States Census Bureau, 2012-2016 American Community Survey 5-Year Estimates..
[57] Affidavit for Search Warrant, April 12, 2016, 7.
[58] Affidavit for Search Warrant, April 12, 2016, 7.

apparently, suspected gang member, who provided the information to an official source almost seven months before the search itself. Any reasonable officer would have known that the characteristics of the area and of Mr. Menefield himself created a high risk that any information he provided at the time of his release from prison in September 2015 would not be accurate in April 2016. No reasonable officer would have relied on this limited, dated information to determine Mr. Menefield's current address.

The warrant and affidavit in support thereof simply do not include even minimally reliable information that could establish probable cause of a nexus between 19409 Milan Drive and evidence related to Mr. Menefield and his criminal activities.

For the foregoing reasons, it is my opinion that no reasonable officer would have relied on the search warrant.

### 3. The Officers Appear to Not Have Knocked and Announced Prior to Breaching the Door

The GoPro video is not dispositive, but my review of it suggests that the officers appear to not have knocked and announced prior to breaching the door.

It is highly unlikely that a well-trained tactical team would initiate an entry by knocking and announcing their presence before perimeter officers were in position.

In this case, multiple officers approaching from the west of the target address, were not yet in position at the time an officer yells, "Window, window, window" at 0:00:54 on the video.

- At 0:00:48, an officer is shown walking between the two houses immediately west of the target address, presumably to take a position viewing the back of the target address. The video does not show the officer's location after that point, but it is unlikely that the officer made it into position within the subsequent six seconds.

- At 0:00:54, the officer immediately in front of the officer wearing the GoPro is not even halfway through the yard of the house to the west of the target address. This officer makes it to a position behind the white vehicle in the driveway immediately west of the target address at 0:00:59.

- At 0:00:54, the officer wearing the GoPro is standing on the far side of the yard west of the target address and does not appear to have drawn his firearm yet. This officer makes it to a position near the stairs of house immediately west of the target address at 0:01:01.

This timing and positioning suggests that, as of 0:00:54 on the video, the officers stacking at the front door had not yet knocked and announced their presence. That would be consistent with reports by Officers Ben Lang and Robert Soltis that suggested seeing movement prior to any knock-and-announce.[59]

---

[59] South East Area Law Enforcement SWAT Team Member Statement of Ben Lang, p. 1; South East Area Law Enforcement SWAT Team Member Statement of Robert Soltis, p. 1.

At 0:00:56, at about the same time the yelling officer can be heard saying, "Hands up!" for the first time, a single bang can be heard. At 0:00:59, shortly after the yelling officer has finished saying, "Hands up, window!" a louder bang can be heard. Although the video is not dispositive on this point, the timing suggests that the first bang is the sound of officers' breaching the front door, and the second bang is the deployment of a Noise-Flash Diversionary Device (NFDD), which typically have a short (1.5 to 2 second) delay between activation and detonation. It is possible that the first bang is the NFDD and the second is the sound of Mr. Carr firing his gun, given that Mr. Carr fired either "upon," "immediately after," or "a few seconds after" the detonation of the NFDD,[60] although that seems unlikely: NFDDs are, for the most part, significantly louder than pistols.

For the foregoing reasons, it is my opinion that the officers appear to not have knocked and announced their presence prior to breaching the door.

**Submission**

The preceding constitutes my preliminary report regarding events related to the interactions between officers employed by multiple police agencies and Andrew Carr. This preliminary report is based on the materials reviewed to date. Should any subsequent information cause me to expand, add, or revise any of my opinions, I reserve the right to supplement this report accordingly.

Respectfully Submitted,

*/s/ Seth Stoughton*
Seth Stoughton
August 31, 2018

---

[60] Maple Heights Police Department Report, 4/18/2016 15:17, p. 12; Affidavit Establishing Probable Cause for Warrantless Arrest, 2016 APR 15 PM 4:08 (Andrew Carr), p. 1; S.E.A.L.E. SWAT After Action Report, p. 2.